UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

DAVID HU,

Defendant.

No. 20-CR-00360 (AKH)

---

**AMENDED SENTENCING MEMORANDUM ON BEHALF OF DAVID HU**

SCHULTE ROTH & ZABEL LLP

Howard Schiffman
Jason T. Mitchell

919 Third Avenue
New York, New York  10022
Telephone:  212.756.2000

MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY, AND POPEO, P.C.

Barry A. Bohrer

Chrysler Center
666 Third Avenue
New York, New York  10017
Telephone:  212.935.3000

*Attorneys for David Hu*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

THE GUIDELINES CALCULATION.........................................................................2

LEGAL STANDARD...................................................................................................3

DISCUSSION ..............................................................................................................6

I.      A DOWNWARD VARIANCE FROM THE STIPULATED GUIDELINES RANGE
        IS WARRANTED AND WILL SERVE THE GOALS OF 18 U.S.C. § 3553(a)..............6

        A.      David's history and characteristics call for a substantial downward variance
                under 18 U.S.C. § 3553(a)(1).....................................................................6

                1.      Poor Health and Reduced Life Expectancy ..................................7

                2.      David's Background and Devotion to Helping Others and His Family ......9

                3.      Acceptance of Responsibility and Voluntary Efforts to Assist Victims....18

        B.      The nature and circumstances of the offense are distorted by the Guidelines'
                application of the loss amount. .............................................................20

II.     THERE IS NO NEED FOR A PERIOD OF INCARCERATION BEYOND 60
        MONTHS UNDER SECTION 3553(a)(2)......................................................22

        A.      A sentence of 60 months would reflect the seriousness of the offenses,
                promote respect for the law, and provide just punishment. ...................22

        B.      The requested sentence would provide adequate deterrence to criminal
                conduct and protection for the public. ..................................................22

        C.      The requested sentence would provide David with needed medical care in the
                most effective manner...........................................................................25

III.    THE GUIDELINES ARE NOT AN APPROPRIATE GUIDE FOR SENTENCING
        IN THIS CASE ..................................................................................................25

        A.      The Guidelines grossly exaggerate the length of pre-Guidelines sentences..........27

        B.      The Loss Table is not based on empirical data....................................29

        C.      The Guidelines do not accurately reflect current fraud sentencing practice..........31

        D.      Imposing a sentence influenced by the Guidelines would be inappropriate
                here.......................................................................................................35

CONCLUSION.................................................................................................................................35

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*Gall v. United States*,
    552 U.S. 38 (2007)...........................................................................................4, 5, 25

*Kimbrough v. United States*,
    552 U.S. 85 (2007).........................................................................................5, 25, 34

*Nelson v. United States*,
    555 U.S. 350 (2009) (per curiam)...............................................................................4

*Pepper v. United States*,
    562 U.S. 476 (2011).....................................................................................................4

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93
    (2d Cir. 2008)..................................................................................4, 23, 25, 31

*United States. v. Algahaim*,
    842 F.3d 796 (2d Cir. 2016)......................................................................................26

*United States v. Blaszczak*,
    No. 1:17-cr-00357 (S.D.N.Y.) ECF No. 412 (Sentencing Tr. )..............................34

*United States v. Block*,
    No. 1:16-cr-00595 (S.D.N.Y.) ECF No. 169 (Sentencing Tr. )..............................33

*United States v. Booker*,
    543 U.S. 220 (2005).....................................................................................................5

*United States v. Buie*,
    No. 05-CR-644 (JPO), 2020 U.S. Dist. LEXIS 239660
    (S.D.N.Y. Dec. 21, 2020) ............................................................................................8

*United States v. Caspersen*,
    No. 1:16-cr-00414 (S.D.N.Y.) ECF No. 37 (Sentencing Tr. )...............................33

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008).....................................................................................4, 5

*United States v. Cooney*,
    No. 1:16-cr-00371 (S.D.N.Y.) ECF No. 801 (Sentencing Tr. )..............................33

*United States v. Corsey*,
    723 F.3d 366 ...............................................................................................................31

*United States v. Douglas*,
   713 F.3d 694 (2d Cir. 2013)......................................................................5-6

*United States v. Jenkins*,
   854 F.3d 181 (2d Cir. 2017)......................................................................24, 25

*United States v. Johnson*,
   No. 16-Cr.-457-1 (NGG), 2018 WL 1997975 (E.D.N.Y. April 27, 2018).........................32

*United States v. Lumiere*,
   No. 16-cr-00483 (S.D.N.Y. June 14, 2017), ECF No. 115 (Sentencing Tr. )...................31, 34

*United States v. Ministro-Tapia*,
   470 F.3d 137 (2d Cir. 2006).......................................................................6

*United States v. Parris*,
   573 F. Supp. 2d 744 (E.D.N.Y. 2008) ...........................................................32

*United States v. Preacely*,
   628 F.3d 72 (2d Cir. 2010).......................................................................4

*United States v. Stewart*,
   590 F.3d 93 (2d Cir. 2009)......................................................................23

*United States v. Tutty*,
   612 F.3d 128 (2d Cir. 2010).......................................................................5

*United States v. Vaid*,
   No. 1:16-cr-00763 (S.D.N.Y.) ECF No. 793 (Sentencing Tr. )...............................34

*United States v. Weigand*,
   No. 1:20-cr-00188 (S.D.N.Y.) ECF No. 326 (Sentencing Tr. )...............................34

**Statutes**

18 U.S.C. § 3553(a) ..............................................................................*passim*

18 U.S.C. § 3553(a)(1)...........................................................................4, 6

18 U.S.C. § 3553(a)(2)(A)........................................................................22

18 U.S.C. § 3553(a)(2)(B)-(C)....................................................................22

18 U.S.C. §3553(a)(2)(D).........................................................................25

18 U.S.C. § 3553(a)(6)...........................................................................4

18 U.S.C. § 3553(e) .............................................................................18

28 U.S.C. § 991(b)(1)(A)............................................................................................26

**Sentencing Guidelines**

United States Sentencing Commission's *Guidelines Manual*, § 2B1.1 (2012) ..........30, 31, 32, 35

United States Sentencing Commission's *Guidelines Manual*, Ch. 1 pt. A(3) (1987)............................................................................................26

United States Sentencing Commission's *Guidelines Manual*, Ch. 1, pt. A(4)(d) (1987)............................................................................................29

**Other Authorities**

Andrew von Hirsch, *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) ....................................................................23

Barry Boss and Kara Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It*, 18 Ohio St. J. Crim. Law, 605 (2020-2021)................................21, 26, 29, 30

CDC, *Obesity, Race/Ethnicity, and COVID-19, available at*: https://tinyurl.com/yckwpttp;..........................................................................8

CDC, *People with Certain Medical Conditions, available at*: https://tinyurl.com/2p8948fe;..........................................................................8

CPI Inflation Calculator, https://data.bls.gov/cgi-bin/cpicalc.pl ............................................ 29-30

Erin C. Dougherty, *ABA Task Force Proposes Significant Change to Fraud Guidelines, available at* https://tinyurl.com/4c9v37a8............................................................30

James E. Felman, *Reflections on the United States Sentencing Commission's 2015 Amendments to the Economic Crimes Guideline*, Fed. Sent'g Rep., Vol. 27, No. 5 288-92 (June 2015), *available at* https://tinyurl.com/y74v7mv3 .................................31

Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988) ...........................26, 29

Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* (1998) ...........................................................................27-28

Mark H. Allenbaugh, *Sentencing in Chaos: How Statistics Can Harmonize the "Discordant Symphony,"* 32 Federal Sentencing Reporter Volume 32, Number 3 (Feb. 2020)............................................................................5

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice 1, (2006)............................................................................................23

Raymond Paternoster, *How Much Do We Really Know about Criminal Deterrence*, 100 J. Crim. L. & Criminology 765 (2010) ........................................................24

U.S. Sentencing Commission, Interactive Data Analyzer, https://tinyurl.com/mst97e54 .................................................................................................32

U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 28 (May 2004) ................................ 24-25

U.S. Sentencing Commission, *The Influence of the Guidelines on Federal Sentencing: Federal Sentencing Outcomes, available at* https://tinyurl.com/ke63vxpm ............................................................................................ 26-27

*Why We Tend to Rely Heavily Upon the First Piece of Information We Receive,* The Decision Lab, *available at* https://tinyurl.com/y6r7p5mm...............................................27

David Hu respectfully submits this Memorandum in anticipation of sentencing, currently scheduled for April 11, 2022.  On January 8, 2021, Mr. Hu pled guilty, pursuant to a plea agreement, to an Information charging him with conspiracy to commit investment adviser fraud, securities fraud, and wire fraud (alongside his business partner and co-conspirator, Martin Silver), as well as separate counts of securities fraud and wire fraud.

## PRELIMINARY STATEMENT

David Hu is a man who worked tirelessly throughout his life to build a life befitting the American dream, but made a terrible error in judgment and continued to double down on that mistake, leading to his appearance before this Court.  His relatives and friends describe him as the "pillar" and "backbone" of a large extended family around the world, many members of which have submitted letters of support to this Court emphasizing his innumerable good deeds and generosity, how his crimes were shocking and out of character, and his importance to his family— particularly to his wife, Sandra, in her battle against cancer.  David is deeply ashamed of his actions, the impact they have had on the victims, and the fact that so many of those whom he has supported throughout his life have felt compelled to support him in this process.  Since his initial meetings with staff of the Department of Justice and the Securities and Exchange Commission, he has engaged in extensive efforts to assist the liquidators and trustees of the funds previously managed by the company he co-founded to recover as much value as possible for their investors.

We seek to put into context David's conduct and to show that his crimes do not define the man that David is:  a hard worker who has otherwise lived a life of honesty and loyalty, both as a family man and as a caring mentor to his colleagues.  He has significant health problems which, in conjunction with his age, would render any sentence in the advisory Guidelines range a de facto life sentence and deprive him from seeing his treasured family again as a free man.  He is also a man whose punishment has already begun, having lost his career and reputation, and having

dishonored his family. David faces impending bankruptcy due to an insurmountable forfeiture amount which will drain the savings that David and his wife, Sandra—whose cancer has only recently gone into remission thanks in large part to David's tireless care and support—were depending on to sustain them in the golden years of their lives. He will miss huge portions of the lives of his children and his infant grandson, and the familial and cultural heritage that he has devoted his life to preserving is at risk of being lost. Due to David's history and circumstances, a sentence in the advisory Guidelines range would be greater than necessary.

Even without this context, the advisory Guidelines range of 235 to 293 months is draconian. Indeed, the Presentence Investigation Report prepared by the United States Probation Office (ECF No. 41) ("PSR") recommends a substantial downward variance of 180 months (PSR at 29), but even that sentence is far longer than necessary based on David's history and personal characteristics, as well as the nature of his crimes and the loss amount. In fact, courts in this district, this circuit, and throughout the country routinely impose variant sentences of well under half the advisory Guidelines range in fraud cases. Moreover, the advisory Guidelines range here fails to account for the extensive voluntary assistance David has offered to those impacted by his crimes and those investigating this matter.

We respectfully submit that a sentence of imprisonment no greater than 60 months is both significant and sufficient punishment under an individualized assessment of the 18 U.S.C. § 3553(a) sentencing factors. A longer sentence is not necessary to achieve the statutory goals of sentencing.

## THE GUIDELINES CALCULATION

The Probation Department's guidelines calculation accords with that of the plea agreement and is as follows:

| | |
|---|---|
| Base offense level for conspiracy to commit investment advisory fraud, securities fraud, and wire fraud (18 U.S.C. § 371); securities fraud (15 U.S.C. §§ 78j(b) & 78ff); and wire fraud (18 U.S.C. § 1343), grouped pursuant to § 3D1.2(d) | 7 |
| Enhancement because the loss or intended loss amount was more than $65 million and less than $150 million, pursuant to § 2B1.1(b)(1)(M) | +24 |
| Enhancement because the offense resulted in substantial financial hardship to 10 or more victims, pursuant to § 2B1.1(b)(2)(A)(i) | +2 |
| Enhancement because a substantial part of the fraudulent scheme was committed from outside the U.S. and because the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting the sophisticated means, pursuant to § 2B1.1(b)(10)(B) & (C) | +2 |
| Enhancement because the offense involved a violation of securities law and at the time of the offense, the defendant was an investment adviser, pursuant to § 2B1.1(b)(20)(A)(iii) | +4 |
| Enhancement because the defendant was an organizer, leader, manager, or supervisor in any criminal activity, pursuant to § 3B1.1(c) | +2 |
| Reduction pursuant to § 3E1.1(a) and (b) for acceptance of responsibility | -3 |
| **Total Offense Level** | **38**[1] |

David has a total criminal history score of zero and is in Criminal History Category 1. PSR at 29. The Stipulated Guideline Range is 235 to 293 months' imprisonment. PSR, ¶ 91. The Probation Department recommends that the Court sentence David to a non-guidelines sentence of 180 months' imprisonment. PSR at 29. We ask Your Honor to impose a sentence of no greater than 60 months' imprisonment.

## LEGAL STANDARD

The Court must "impose a sentence sufficient, but not greater than necessary," to comply with the statutory purposes of sentencing. 18 U.S.C. § 3553(a). As the Supreme Court has recognized, "the principle" underlying sentencing is that "'the punishment should fit the offender

---

[1] *See* PSR at ¶¶ 42-54.

and not merely the crime.'" *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)); *see also United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) (defendant should receive credit for good deeds "not performed to gain status or enhance his image"). Therefore, in rendering "an individualized assessment based on the facts presented," the Court must consider the seven factors identified in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also* 18 U.S.C. § 3553(a)(1) & (6) (listing, among other factors, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted disparities in sentencing). One of the seven factors is, of course, the applicable Guidelines range. *Gall*, 552 U.S. at 49. The Guidelines, however, are "truly advisory." *United States v. Preacely*, 628 F.3d 72, 79 (2d Cir. 2010). Indeed, the Supreme Court has made clear that a sentencing court should not even presume a sentence within the advisory Guidelines range will comply with the statutory purposes of sentencing. *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.") (emphasis original). To the contrary, a district court "must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008).

In doing so, the sentencing court may even reject the Guidelines on policy grounds. That is, "[a] district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that [policy] disagreement applies to a wide class of offenders or offenses." *Id*. at 191. For instance, a policy disagreement may arise, where, as here (*see infra* at Section III), an applicable provision was not based on empirical data of past sentences and national experience, such that it "do[es] not exemplify the Commission's exercise of its characteristic

institutional role." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007). In these instances, it is well within the sentencing court's discretion to determine that the Guidelines would "yield[] a sentence 'greater than necessary' to achieve § 3553(a)'s purposes." *Id.* at 109-110. In fact, the Second Circuit has held that a district court commits procedural error when it concludes "that it could not consider a broad, policy-based challenge to the [applicable] Guidelines." *United States v. Tutty*, 612 F.3d 128, 131 (2d Cir. 2010).

More generally, the justification for rejecting a Guidelines sentence need only be "sufficiently compelling" in light of the individualized assessment under § 3553(a). *Gall*, 552 U.S. at 50. A sentence outside the Guidelines range does not require the sentencing court to find "extraordinary" circumstances, because such a requirement would "come too close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range." *Id.* at 47. "District judges are, as a result, generally free to impose sentences outside the recommended range." *Cavera*, 550 F.3d at 189. Accordingly, district judges in this Circuit and around the country have done just that. A recent study of sentencing outcomes following the Supreme Court's decision in *United States v. Booker*, which held that the Guidelines were "merely advisory," 543 U.S. 220, 233 (2005), concluded that the *majority of all sentences* imposed for offenses including fraud were "well below the bottom of the applicable [advisory Guideline] range." Mark H. Allenbaugh, *Sentencing in Chaos: How Statistics Can Harmonize the "Discordant Symphony,"* 32 Federal Sentencing Reporter Volume 32, Number 3, at 132 (Feb. 2020).

Ultimately, "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime" (*Cavera*, 550 F.3d at 188) as long as that sentence is "sufficient, but not greater than necessary" to comply with the purposes of sentencing. *See* 18 U.S.C. § 3553(a). Those purposes include "proportionality, deterrence,

incapacitation, and rehabilitation." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). The Second Circuit has explained that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, it must choose the lower sentence. *See United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006).

Below are the Section 3553 factors and their application to David in support of the requested sentence of 60 months.

## DISCUSSION

I. **A DOWNWARD VARIANCE FROM THE STIPULATED GUIDELINES RANGE IS WARRANTED AND WILL SERVE THE GOALS OF 18 U.S.C. § 3553(A)**

A. **David's history and characteristics call for a substantial downward variance under 18 U.S.C. § 3553(a)(1).**

David's history and characteristics demonstrate that a substantial downward variance is appropriate. As indicated in the PSR, David has no prior criminal history and, due to his age and health, the shuttering of the business he co-founded, International Investment Group, LLC ("IIG"), and the loss of his licenses and reputation, he poses no risk for recidivism. *See* PSR ¶¶ 55-57, 69-70, 76. David's age and poor health all but guarantee that a sentence within the Guidelines range will effectively be a life sentence, and will ensure that David will never again be able to see his family as a free man. The letters submitted to the Court on David's behalf, prepared by those closest to him and those whose lives he has touched, paint a vivid picture of a generous, self-reliant, loyal, protective, and fundamentally decent man with a keen sense of obligation to help others and respect his ancestors in maintaining a sense of togetherness despite coming from a family spread across three continents. Moreover, David has not only accepted responsibility by pleading guilty in this matter; he has also voluntarily engaged in extensive efforts to try to right his wrongs. He has extensively shared information with the Department of Justice and the Securities and Exchange Commission, repeatedly met with and assisted the liquidators and trustees

currently administering the funds that IIG formerly managed to help them recover as much value for their investors as possible under the circumstances, and assisted investors in obtaining access to funds locked up in bank accounts established for former IIG affiliates. These characteristics justify a downward variance and a sentence far below the applicable Guidelines range, and even greater than the downward variance of 180 months recommended by the Probation Department. *See* PSR at 29.

### 1. Poor Health and Reduced Life Expectancy

Unfortunately, David is in poor physical health and, at age 64 at the scheduled date of sentencing, is not likely to live to the end of a sentence within the Guidelines range. As noted by the Probation Office, David is obese and suffers from both cardiovascular and respiratory disorders that require regular medication, inhalers, and nebulizer treatments. PSR ¶¶ 69-70.

Those issues are further detailed in a medical evaluation conducted in July 2021 by Dr. Jonathan St. George, MD of the Columbia College of Physicians & Surgeons, attached hereto as Appendix A. Dr. St. George concluded that David is "currently afflicted with several active medical issues that impact him on a daily basis, and that have potential serious implications for his life expectancy, as well as his quality of life in the future." Appendix A at 1. Specifically, David suffers from atrial fibrillation, a type of cardiac arrhythmia that requires daily blood thinning medication, making him susceptible to spontaneous or trauma-induced internal bleeding. *Id.* As a result, his cardiac condition reduces life expectancy on average by 2-3 years, "assuming that he will get optimal care for this condition." *Id.* David also suffers from metabolic syndrome and is morbidly obese, with a body mass index ("BMI") of 41, which may shorten his life expectancy by up to 14 years based on a study by the National Institute of Health. *Id.* at 2. Further, he has sleep apnea, which places "increased strain on the heart and also increases the risk of serious heart complications or stroke." *Id.* Finally, David has longstanding respiratory problems that require

him to use inhalers to help him breathe even when getting a simple cold or a respiratory infection. *Id.*

All told, these health issues significantly reduce David's life expectancy from the 78 years for the average male.  In Dr. St. George's words, these conditions "could contribute to upwards of 14-16 years of decrease in life expectancy" and that, for David, "the likelihood of reaching . . . even a healthy retirement age of 65 is in serious jeopardy." *Id.* at 3.  David's health challenges are particularly concerning given the ongoing COVID-19 pandemic and the uncertainty over new variants of that virus (as already seen in the surges of infections and deaths caused by the Delta and Omicron variants) and the degree of care that the Bureau of Prisons will be able to offer for such emergent threats, in addition to his preexisting conditions.  Notably, his BMI of 41 falls within the range of "severe obesity" and is a COVID-19 comorbidity factor pursuant to guidance from the Centers for Disease Control ("CDC"), meaning that David is up to three times more likely to be hospitalized, need intensive care, require a ventilator to help him breathe, or die if he contracts COVID-19 while in prison.  CDC, *People with Certain Medical Conditions*, *available at*:  https://tinyurl.com/2p8948fe; CDC, *Obesity, Race/Ethnicity, and COVID-19*, *available at*:  https://tinyurl.com/yckwpttp; *see also United States v. Buie*, No. 05-CR-644 (JPO); 15-CV-3945 (JPO), 2020 U.S. Dist. LEXIS 239660, at *4-5 (S.D.N.Y. Dec. 21, 2020) (holding that sentence reduction through compassionate release was appropriate for "66-year-old man who is obese and has other health issues" who faced "a heightened risk of severe illness or death from Covid-19" that "is likely to be magnified in a prison setting").

For these reasons, the incarceration range under the Guidelines of 235 to 293 months, or even the downward variance of 180 months recommended in the PSR, is likely to ensure that David will not have a chance of living long enough to complete his sentence.  Even the requested

sentence of 60 months poses a significant threat that David will not live to the end of his term, but it at least provides a possibility of not dying in prison.

### 2. David's Background and Devotion to Helping Others and His Family

Before the events that brought him before this Court, David's life typified the American dream. David was born in Guatemala City, Guatemala on October 3, 1957. PSR ¶ 60. He grew up in an immigrant household: his father was a native of China that served as a diplomat from the Taiwanese government, and his mother is a first-generation Guatemala native whose father had emigrated from China as well. *Id.* David's ancestors had fled China following the Chinese Civil War and Communist Revolution in search of safety and a better life. *Hwaipin (Stacy) Chen.*[2] David was raised in a middle-class household in Guatemala City in the Catholic faith, but was sent by his parents when he was six-years-old to live with his grandmother and relatives in Hong Kong to learn about his heritage and to speak and write in Cantonese. PSR ¶¶ 60, 62; *Benjamin Wu; Betty Wu*. David returned to Guatemala four years later, and as a result of his early life experience he became fluent in Spanish, Cantonese (and later Mandarin), and English, with an understanding of and connection to both Western and Eastern cultures. *See id.* He then attended college at San Carlos University in Guatemala City, where he earned a degree in civil engineering in 1980. PSR ¶ 75.

David's early exposure to his father's immigrant experience, his extended family, and ancestral history and culture have profoundly shaped his life. David, as well as his two younger siblings, Henry and Margarita, all immigrated to the United States from Guatemala in search of a safe and prosperous future, just as their father had done when he emigrated to Guatemala. *See id.*

---

[2] Italicized names herein refer to the letters submitted to the Court on behalf of David, copies of which are attached hereto for reference as Appendix B.

at ¶¶ 60-61.  David first traveled to this country in 1981 on a student visa to attend Arizona State's Thunderbird School of Global Management, where he earned a Master of Business Administration degree in International Management.  *Id.* at ¶ 74.

Following graduate school, David built up his career and put down roots in the United States.  He began working in the financial sector, first for Mellon Bank in Pittsburgh, Pennsylvania, where he was hired in 1982.  *See* PSR ¶ 80.  While working at Mellon Bank, David married his wife, Sandra; like his mother, Sandra was a Guatemala native whose parents were Chinese immigrants.  *Sandra Hu*.  Although David continued to work for Mellon Bank until 1987, he was dispatched to live and work in Spain for two years before returning to the United States on a work visa and ultimately settling in New Jersey, where he resides to this day.  *See* PSR ¶¶ 63-65.  David then became a legal permanent resident in 1991 and became a naturalized citizen on February 14, 1997.  *See id.* at ¶ 63.  David and Sandra raised two children, Kevin (now age 35, residing in Wheeling, Illinois) and Kelly (age 30, residing in San Diego, California), and, tragically, lost a third child in 1996.  *See id.* at ¶ 64; *Sandra Hu*; *Kelly Hu*; *Kevin Hu*.

David's role at Mellon Bank ultimately led to his career in trade finance, which resulted in his founding of IIG, along with co-conspirator Martin Silver.  David learned about credit and trade finance at Mellon Bank and worked on a small team on the bank's Latin America desk until 1987, when most of his team was hired by American Express.  *See* PSR ¶¶ 78, 80.  While at American Express, he met Silver and continued to develop an expertise in credit and trade finance; during that time, David, Silver, and another co-worker, Eric Garcia, all discussed starting a trade finance business together.  In 1990, David was hired by Nomura Securities, where he started as a trader of emerging market debt and worked his way up to become the head of the group.  *See id.* at ¶ 80.

After Smith Barney hired David and the group he worked with away from Nomura in 1993, David and Silver founded IIG in 1994. *See id.* at ¶¶ 78-79.

IIG and its affiliates were focused on originating trade finance loans to small and medium-sized merchants, traders, and processors (primarily located in Central and South America), and providing investment management and advisory services to funds holding portfolios of those loans. *See*, *e.g.*, Information (ECF No. 2), ¶¶ 3-4. Over the course of IIG's existence, the majority of those trade finance loans were legitimate and performing: the borrowers repaid the loans, which allowed those smaller businesses in relatively impoverished countries to expand and succeed. Indeed, at the time of the Information, the funds IIG advised still held performing loans whose borrowers were timely repaying their debts. At its peak, IIG employed 27 staff in addition to David and Silver, nearly all of whom were unaware of the fraudulent acts described in the Government's information. The vast majority of the management fees that IIG earned—and that are the basis for the loss amount that drives David's high Guidelines range—were used to pay its staff, as well as the independent outside auditors and administrators that provided services for the funds IIG advised.

Regrettably, when certain borrowers began to default on their loans and the value of those loans became impaired, David agreed at Silver's suggestion to avoid recognizing losses and continue to carry those loans on IIG's books at par value. *See* PSR ¶¶ 16-17. When those unrecognized losses began to mount, David helped facilitate Silver's plans to replace certain non-performing loans on IIG's books with fabricated loans to fictitious borrowers, and to use funds generated by reselling and securitizing loan portfolios and misdirecting payments by borrowers to repay investors who sought to redeem. *See id.* at ¶¶ 18-20. As those unrecognized losses snowballed, Silver and David became increasingly desperate to conceal them. The actions

described in the Information, for which there is no excuse, were Silver and David's final failed efforts to outrun their prior misconduct.

Prior to those misdeeds, David's life had been the embodiment of the American dream: he is a man who came to this country speaking English as a third language who built what was, for a time, a successful career and business while raising two successful, independent, all-American children. David was determined to pay forward his cultural education and success, to help those less fortunate and honor those that came before him.

> **(a)** **"The desire to care for and help others is the most striking aspect of David's character"[3]**

There is nothing more important in David's life than helping others, as evidenced by the numerous letters submitted in his support to urge leniency in his sentencing and to give the Court insight into, in David's nephew's words, "the tremendous impact he has had on his family, acquaintances, and community . . . ." *Christopher Woo*.

David has devoted his life outside of work to helping others who were less fortunate, including strangers and distant relatives. "After his success with IIG, David did not become arrogant, and did not live a lavish lifestyle. Instead, he practiced what he had learned. He selflessly supported needy relatives, friends, and orphanages with genuine care and concern." *Winston Woo*. David routinely told his children that, "'when it comes to family, we must always try to help each other out,'" and David's actions prove that he has lived by that motto. *Sandra Hu*. The letters submitted to the Court describe numerous instances where David would "without people asking, send[] funds to relatives who needed temporary financial assistance." *Benjamin Wu; Betty Wu.* "He always cared for the less fortunate and impoverished relatives, particularly those left behind

---

[3] *Christopher Woo.*

12

in mainland China, and would help them out however he could." *Katie Woo.* Those acts included "help[ing] with medical bills and other situations when we are not able to do it by ourselves." *Manuel De Leon Jimenez.* Similarly, David purchased a tombstone for a cousin in Guatemala whose family could not afford it. *Henry Hu.* "David's warm and compassionate attitude towards the needy stands out. He once asked me how he could help our daughter, who has special needs, later in life. This brought tears to my eyes." *Winston Woo.*

David also ensured that others would have the same opportunities to pursue their dreams that he did, including by assisting his sister-in-law's family in obtaining United States citizenship. "One thing that I will always be grateful to [David] for is how he helped my immediate family and I obtain our citizenship in this wonderful country. It was not an easy process, and not a quick one either, but we were lucky to have someone patient and willing to help see it through even though he knew it would be a multi-year process with some financial help as well. . . . you could feel this was something he was doing out of the kindness of his heart to help our family be put in a better position to succeed in life." *Manuel De Leon.* His wife recalled that when "hefty government fees [were] due" that imperiled the application, "David immediately paid the fees, no questions asked, and did not tell me until after he mailed the checks. My heart was in my stomach, knowing that he changed their lives and did it so humbly." *Sandra Hu.* "Without [David], we wouldn't be citizens today," said his niece. *Ximena De Leon.* That support "highlights how much of a selfless, caring, and family-oriented person he is at his core." *Manuel De Leon.* David and Sandra's support so profoundly impacted his sister-in-law's family that his niece asked that they be the godparents of her marriage. *Ximena De Leon.*

David's acts of kindness have never been limited to financial assistance. When David's cousin was going through chemotherapy for breast cancer, David was there to support her.

*Christopher Woo.* When another cousin had separated from her husband, David drove from New Jersey to Toronto to visit and take her child to the zoo; he also drove from New Jersey to Ohio—the midpoint between David's home and Toronto—to take his cousin's daughter to an amusement park. *Betty Wu.* David also flew to Taipei for one day at the last minute to represent the family of his niece's husband, whose parents were too old to travel outside the country. "We were touched by Uncle David's willingness to support his family no matter what it costs and how busy his schedule was as a successful entrepreneur." *Hwaipin (Stacy) Chen.*

David has also served a valuable role as a professional mentor to colleagues and to younger family members. In the words of his coworker and mentee, "I had the fortune of working with some brilliant and capable people all over the world; none of them had a deeper influence on my career and job than David Hu." *George Geringer.* David offered his nephews, cousins, and children a chance to get professional experience, including by offering internships and free room and board to help build their resumes and to offer a place to stay to family visiting the New York City area. *Christopher Woo.* When David's cousin's son was in college and "a bit lost, . . . David took him under his wings and mentored him. [David] offered an opportunity for [his cousin's] son to spend a summer at his firm and stay at their house . . . ." *Katie Woo.* He also offered those experiences to his own children, teaching them the value of hard work. *Kelly Hu; Kevin Hu.* "Through these experiences, my dad helped me learn about the value of working your way up in the workplace, and helped jumpstart my career life as a professional." *Kevin Hu.*

(b)     **"[A] pillar of strength and unity in our family"[4]**

David has strived to foster connections among relatives and maintain family bonds, using his resources to bring people together despite being scattered across North America, Central

---

[4] *Kristin Woo.*

America, and Asia.  Those actions, which were informed by his own experience as a child, "helped ensure that our family history is both preserved and that we learn lessons from our past." *Christopher Woo*.  In the words of David's brother, "[h]e is the glue that holds the family together keeping many of our relatives in touch to ensure the family memories and values are not lost with time and distance." *Henry Hu*.

"He is the type of person to bring us all together to a specific place . . . in order to just spend quality family time." *Diego De Leon*.  As examples, David organized a 50th anniversary celebration party for his parents in Guatemala, inviting "friends and family to join the celebration from all over the world," including by paying for flights and room and board for relatives that could not otherwise afford to attend and strengthen family bonds.  *Hwaipin (Stacy) Chen*.  David's nephew wrote of how David would rent out a whole bus to help his relatives maximize their time together during other trips to Guatemala.  "No one asked him to do this, it was just him surprising us in hopes that our whole family would have a good time and bond because we do not always get to see each other due to all of us living in different areas." *Manuel De Leon*.  David also ensured his relatives in Guatemala could spend time with the family in America.  "Often times, these family members [in Guatemala] would not have the financial means to come visit us in the U.S., so it would be my dad who would help facilitate those trips and host them at our home here in New Jersey." *Kevin Hu*.  Similarly, when David's niece visited the East Coast for the first time in 2002, he invited her and her friend to stay at their house, and then gathered all of the extended family to throw a welcome dinner for his niece in Chinatown in New York City, an experience that "deeply moved" his niece.  *Hwaipin (Stacy) Chen*.

David has also prioritized fostering those connections for his children and through acts of appreciation for his ancestors.  David organized a family trip to China to allow his father, who

passed away in 2015, a chance to visit his old friends from military college and to visit places where he fought during the Chinese Civil War. *Betty Wu; Hwaipin (Stacy) Chen.* During that trip, David took his family to his father's village "and hosted a dinner for everyone in the village." *Kelly Hu.* In addition to an ill-fated attempt to teach his children Cantonese, David ensured his children became fluent in Spanish and fostered connections with distant cousins, aunts, and uncles by arranging for them to visit Guatemala each year. *Kevin Hu; Kelly Hu.* In his son's words, "[i]f it had not been for my dad's efforts to show me who these family members [in places like China, Hong Kong, and South Africa] were and bring us together, I do not think I would maintain the close relationships and contact that I have with these family members today." *Kevin Hu.*

That same devotion to family manifested itself in David's own life and travels. Whenever his business travel took him to Hong Kong, China, or Taiwan, David would always stop and pay his respects to the family members with whom he lived as a young child and foster connections with other relatives. *Benjamin Wu; Betty Wu; Hwaipin (Stacy) Chen.* "He would always go to our grandmother's grave and paid his respects every time he visited Hong Kong." *Betty Wu.* Similarly, David would purposefully schedule business trips to route through Los Angeles to visit family, including his wife's nephews, and a cousin and her parents with whom he had lived in Hong Kong as a child. *Benjamin Wu; Betty Wu; Christopher Woo*; *Diego De Leon.* David viewed that as "the least he could do when they cared for him and taught him when he lived with them at such a young age," and flew from New Jersey to Los Angeles to attend the funeral of his cousin's father. *Benjamin Wu; Betty Wu.* When in South Africa for business, David made a point to seek out his father-in-law's siblings, who had not seen his father-in-law for over 20 years. "When David told them about their get together, it sent [my father] over the moon," said his wife. *Sandra Hu.*

Nowhere has David's commitment to his family been clearer than in his actions to support his wife, Sandra, in her battle against cancer.  "When his wife was diagnosed with cancer, [David] took all the time that was necessary to remain by her side as her #1 support."  *Manuel De Leon Jiminez*.  In Sandra's words:

> When I was diagnosed with breast cancer in October 2016, my world crumbled.  I do not think I would have survived the aggressive treatments my doctor planned without David by my side.  I was scared, but David was my source of hope and the reason I am in remission today.  He constantly pushed me, supported me, and kept my spirits up when I was having a bad day or a bad reaction to the chemotherapy.  David was my rock.  He dropped everything to make sure I was okay. . . .  He was there for every single doctor's appointment, chemotherapy appointment, and follow-up consultation.  David was my voice when I was not able to say anything.

*Sandra Hu*.  David's role in assisting Sandra ensured that she received appropriate care.  As his daughter explained:  "He made sure that she was always up to date with all of her medications and ensured that the doctors knew every single thing my mom felt because she had a hard time expressing her emotions.  After every appointment, he would share it in great detail with my brother and me because we didn't live close to home anymore."  *Kelly Hu*.

Given his central role in Sandra's cancer treatments, David is particularly "worried that he might not be around to take care of Sandra if her cancer ever recurs."  *Winston Woo*.  David still takes Sandra to every follow-up appointment, and relatives have expressed concern for how Sandra—whose English is not as strong as David's—will manage with him incarcerated.  *Sandra Hu; Hwaipin (Stacy) Chen*.  Although his children intend to support their mother during David's incarceration despite living far away, David's role and support is irreplaceable.  As his son said, "it was my dad who helped us all get through this emotional event. . . . [I]t was my dad who kept

---

[5] *Kelly Hu.*

my sister and me up to date on everything that was happening, keeping our spirits up, and telling us that everything was going to be ok with my mom." *Kevin Hu*. "I know deep down, that if it weren't for his constant presence, my mom wouldn't be here with us today. My dad was the one that kept her spirits up high and when the chemotherapy got stronger and stronger, he was my mom's rock and the family's backbone." *Kelly Hu*.

3. **Acceptance of Responsibility and Voluntary Efforts to Assist Victims**

Despite his crimes and fall from grace within his family and community, David has accepted responsibility and has worked to do what he can to help those harmed by his actions. Within his own family, he has urged that his experience should be an example for others never to make similar mistakes. "[W]hatever the outcome of his actions may be, [David] hopes to redeem himself by using his time and experience to help, advise, and encourage others not to make the same mistakes." *Henry Hu*. David has "reiterated how foolish his actions were, and has stressed again and again that if I were ever faced with the same situation not to commit the same errors." *Kevin Hu*.

David has also devoted extensive amounts of his time attempting to work with the Department of Justice and the Securities and Exchange Commission, the liquidators and trustees of the funds that IIG formerly managed, and investors to try to recover as much value as possible and minimize the harms of David's and his co-conspirator's crimes. Although the Government has taken the position that it will not support a motion pursuant to Section 5K1.1 of the Guidelines and 18 U.S.C. § 3553(e) to credit David with "substantial assistance" in the Government's prosecution of others under the factors set forth in Section 5K1.1(a)(1)-(5), it is undisputed that David met with attorneys and investigators within the Department of Justice and the Securities and Exchange Commission over three days to confess and detail his illegal acts, the acts of others known to David, and the harm they have caused to investors in the funds formerly managed by

18

IIG.  David offered to meet further to discuss those issues, but his offer was declined.  Furthermore,

David has cooperated with the Department of Justice's requests to secure the deposit of a check

payable to Venezuela Recovery Fund N.V. ("VRF") in the amount of approximately $6.3 million,

which the Government received on October 29, 2019.  *See* PSR, ¶ 103.

Apart from discussions with Government representatives, and entirely unrelated to his

efforts to assist the Government's investigation, David and his attorneys have spent hundreds of

hours meeting with, answering requests from, and providing his advice to the liquidators, trustees,

and investors seeking to recover as much value as possible in the fallout from IIG's collapse.  As

described by Christopher Kennedy of Alvarez & Marsal, one of the Joint Official Liquidators of

IIG Structured Trade Finance Fund Ltd., IIG Global Trade Finance Fund Ltd., and TOF Cayman

SPV under Cayman Islands law, David and his counsel have met extensively with representatives

of the Joint Official Liquidators and their counsel since late 2019 to provide as much information

as possible to assist in their efforts to maximize recoveries for investors harmed by the fraudulent

scheme at IIG.  *Christopher Kennedy.*  Through those efforts, David has assisted with transferring

control of the trade finance loans that those funds participated in to their management when

possible;  provided access to IIG's data server so that the liquidators could access relevant

background information and communications regarding those loans and their borrowers;  made

introductions to representatives of borrowers, collateral agents, and their counsel; and answered

hundreds of questions concerning assets held by those funds and the funds' books and records.

*See id.*

Similarly, David and his counsel have met with the bankruptcy trustees for the IIG Trade

Opportunities Fund, N.V. and the IIG Trade Opportunities Fund, B.V., based in Curaçao and the

Netherlands, respectively, regarding how best to realize value for loans they hold, including

through the liquidation of collateral and compromise negotiations. Furthermore, David has worked with counsel for an impacted investor in IIG's managed funds, IIG Bank (Malta), to secure the release of monies owed to that investor under one of the trade finance loans originated by IIG's affiliates from IIG's bank, Bank Leumi. In connection with all of these efforts, David ensured that the Department of Justice was aware of and had the opportunity to object to any of the actions that the liquidators, trustees, or investors asked David to take to assist them.

**B.** **The nature and circumstances of the offense are distorted by the Guidelines' application of the loss amount.**

To be sure, David's crimes are serious, and David agreed in pleading guilty to the Government's "loss" calculation of "$129,506,992 . . . representing the amount of proceeds traceable to the commission of the offenses" for purposes of its calculations under the Guidelines. *See* PSR, ¶ 6. David is not challenging the calculation of that loss amount. However, we respectfully submit that the Guidelines' application of that loss amount—which is the key driver of the overall offense level and resulting advisory sentencing range under the Guidelines— overstates David's culpability. That is so because it does not reflect the actual value of the advisory services provided by IIG nor David's personal gain from his crimes. The Court should consider both issues in determining David's sentence.

The loss amount includes a sum of all investment advisory fees charged by IIG for the affected funds during the period at issue, which were based on the reported net asset value of the funds' portfolios, totaling approximately $25 million. As a result, that part of the loss amount does not reflect the fact that substantial portions of the portfolios for those funds were comprised of legitimate trade finance loans, and therefore the advisory fees concerning those legitimate assets were in fact proper. Unfortunately, we cannot precisely calculate the percentages of IIG's advisory fees that concerned properly valued assets versus overvalued or illusory assets, and therefore

cannot advocate for a precise amount of value received by investors for the Court to consider in its sentencing analysis. However, whatever that amount, it would represent a substantial percentage of the advisory fees included in the loss amount.

Similarly, while David's senior role at IIG does permit him to be charged with a loss amount equal to the proceeds earned by the entire organization, it is important to recognize that David's personal pecuniary gain for his crimes represents a small fraction of the overall loss amount. As commentators have observed, the current loss table under the Guidelines is "a poor proxy for relative culpability in many cases," in part because it "fails to account for the extent to which the offender personally profited from the offense." Barry Boss and Kara Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save It*, 18 Ohio St. J. Crim. Law, 605, 617 (2020-2021) (hereinafter, "Boss/Kapp"). The advisory fees paid to IIG funded the salaries of dozens of individuals, including David's, as well as other costs of doing business, including payments for office space and other overhead, for legal and other local advisors for the loans at issue, and for fees charged by independent auditors and administrators for the IIG-managed funds. While David's salary was substantial—approximately $20,000 per month, or $240,000 per year at its peak, plus additional income from year-end distributions (*see* PSR ¶ 78)—it is dwarfed by the loss amount. Thus, the Court should not assume that David has personally received anything close to the loss amount, which is over 40 times his total salary earned during the period at issue.[6]

---

[6] A calculation under the Guidelines based on David's personal compensation for the years 2007 through 2019 as the amount of "loss" would reduce his total offense level to 30, resulting in a Guidelines range of 97-121 months.

## II. THERE IS NO NEED FOR A PERIOD OF INCARCERATION BEYOND 60 MONTHS UNDER SECTION 3553(a)(2).

### A. A sentence of 60 months would reflect the seriousness of the offenses, promote respect for the law, and provide just punishment.

A sentence of 60 months imprisonment would further the goals of 18 U.S.C. § 3553(a)(2)(A), which requires the Court to consider the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." To be sure, a substantial term of incarceration is appropriate for David's offenses, given their seriousness and the Court's interest in promoting respect for the law. What is not appropriate, however, and what would constitute *un*just punishment, is the draconian sentence in the range of 235 to 293 months advised by the Guidelines, or even the 180-month downward variance recommended by the Probation Office. As noted above, any such sentence is likely to go beyond the remainder of David's life. An effective life sentence is not necessary to reflect the seriousness of his crimes, promote respect for the law, or provide additional punishment.

### B. The requested sentence would provide adequate deterrence to criminal conduct and protection for the public.

A sentence of 60 months would also "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant" under 18 U.S.C. § 3553(a)(2)(B)-(C).

As for David specifically, any period of incarceration, much less the requested sentence, is unnecessary to deter him from future criminal conduct or protect the public. David is 64 years old, an age at which he otherwise would be preparing to retire from working entirely but for the repercussions of his conviction on his retirement savings. He has lost the career he spent his entire adult life building, the company he founded that served as the instrumentality of the offenses, his registration as investment advisor, and any possibility of him ever again being placed in a position of trust and confidence with investor funds. Thus, when David completes any sentence, he will

have no job to return to, no prospect of ever again working in his area of expertise, and will be saddled with nearly $130 million in personal debt with no prospect of recovery. These realities are appropriate for the Court to consider when assessing sentencing. *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."). Simply put, the loss of his career, the respect of his peers, his life's savings, and the shame he feels for having betrayed the investors in the funds IIG managed and his family have had a more deterrent effect on David than any period of incarceration ever could.

As to general deterrence, the requested sentence still involves a very substantial period of incarceration that would be sobering for any would-be imitator. Moreover, there is considerable evidence that white collar offenders are strongly deterred by even relatively short sentences. *See United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (citing Richard Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 80 (2005) and Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L. J. 485, 492 (1998)). Conversely, there is no evidence that increases in sentence length reduce crime through deterrence. Empirical research on general deterrence shows that while *certainty* of punishment has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects. Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice 1, 28-29 (2006) (citations omitted). A report published by the Institute of Criminology at Cambridge University reached similar conclusions. *See* Andrew von Hirsch, *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999). The report, commissioned by the British Home Office, examined penalties in the United States as well

as several European countries. It examined the effects of changes to both the *certainty* and the *severity* of punishment. Although significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id.* at 2. The report concludes that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects." *Id.* at 1.[7]

Nor is a greater sentence needed to protect the public from David. With the exception of the present offenses, David has led a law-abiding and commendable life. While David's crimes are inexcusable and wrong, they are unquestionably an aberration. David is truly remorseful for his conduct and has done everything within his power to attempt to atone for it. He understands that he must be held accountable for his actions, but a period of incarceration in excess of 60 months is not necessary to achieve the goals of sentencing.

Empirical data also indicates that the public need not be protected from further crimes by defendants like David. According to a report on recidivism by the United States Sentencing Commission, offenders with similar criminal histories and demographic characteristics as David are highly unlikely to commit another crime. The report states that only 6.9 percent of defendants who—like David—are over 40 and in Criminal History Category I, are even arrested again, let alone convicted. *See United States v. Jenkins*, 854 F.3d 181, 189, 192 (2d Cir. 2017) (rejecting as "shockingly high" a Guideline-range sentence where the district court ignored "definitive research demonstrating that recidivism substantially decreases with age" for first-time, nonviolent offender); *see also* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History*

---

[7] *See also*, *e.g.*, Raymond Paternoster, *How Much Do We Really Know about Criminal Deterrence*, 100 J. Crim. L. & Criminology 765, 818 (2010) ("[W]hile there may be disagreement about the magnitude, there does seem to be a modest inverse relationship between the perceived *certainty* of punishment and crime, but no real evidence of a deterrent effect for *severity*[.]" (emphasis added)).

*Computation of the Federal Sentencing Guidelines* 28 (May 2004) ("*Measuring Recidivism*"). Offenders sentenced under the fraud guidelines are the least likely to recidivate, and recidivism rates are also lower where, as here, the defendant has a college education. *Measuring Recidivism* at 29-30.

In light of these factors, it is extremely unlikely that David will ever come before this or any other Court again, and this factor, too, weighs in favor of a sentence far below the advisory Guidelines range. *See Jenkins*, 854 F.3d 181 at 192; *Adelson*, 441 F. Supp. 2d at 514.

**C. The requested sentence would provide David with needed medical care in the most effective manner.**

As noted in Section I.A.1. above, at 64 years old and in poor health, David is already at serious risk of reaching the end of his life in custody with the requested sentence of 60 months. The longer his sentence, the greater the likelihood that his significant pre-existing health conditions will result in chronic and escalating health problems as David approaches the end of his life. It is not necessary to require the Bureau of Prisons to be responsible for increasingly complex and extensive medical interventions if and when David reaches his 70s. Thus, there is no need for a sentence longer than 60 months, and such a sentence will assist in providing David with medical care consistent with the purpose of 18 U.S.C. §3553(a)(2)(D).

**III. THE GUIDELINES ARE NOT AN APPROPRIATE GUIDE FOR SENTENCING IN THIS CASE**

Although the Guidelines are the "starting point and the initial benchmark" for sentencing (*Gall*, 552 U.S. at 49) in determining a defendant's sentence, the Supreme Court has recognized an exception to that principle when the applicable Guideline is not based on "empirical data and national experience." *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007). That is an accurate description of the fraud Guideline at issue here.

When Congress enacted the Sentencing Reform Act of 1984, it directed the Sentencing Commission to issue guidelines that "assure the meeting of the purposes of sentencing," 28 U.S.C. § 991(b)(1)(A), but the Sentencing Commission couldn't agree on which purposes should predominate—for example, whether principles of just deserts should be given greater weight than incapacitation. Instead, the Commission decided to take its cue from past practice; it issued guidelines that it claimed were based on an empirical study of past sentences. *See* U.S.S.G., Ch. 1 pt. A(3) (1987); Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 7 (1988). In effect, the purposes that judges had previously relied on—the purposes implicit in actual past sentences—would be their guide. But as courts, academics, and even the Commission have recognized, the Guidelines' draconian loss table—which is the key determinant for any Guideline range for fraud crimes—was not developed by the Sentencing Commission using an empirical approach based on past sentencing practices, but rather in response to a call for more regulation in the wake of large financial frauds. *See* Boss/Kapp at 605. Consequently, Section 2B1.1 "routinely recommends arbitrary, disproportionate, and often draconian sentences to first-time offenders of economic crimes . . . driven primarily by Section 2B1.1's current loss table, which has an outsized role in determining the length of [the] sentence." *Id.* at 605-06. Indeed, the Second Circuit has remarked that the Guidelines' approach of using the amount of loss to be the "principal determinant of the adjusted offense level and hence the corresponding sentencing range" is "unknown to other sentencing systems" and that "its unusualness is a circumstance that a sentencing court is entitled to consider." *United States. v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016).

Despite the increasing disconnect between actual sentencing practice and the Guidelines (discussed in Section III.C., *infra*), the Guidelines continue to have a "substantial influence" on

sentence outcomes.  *See* U.S. Sentencing Commission, *The Influence of the Guidelines on Federal Sentencing: Federal Sentencing Outcomes*, 2005-2017, *available at* https://tinyurl.com/ke63vxpm (the "Commission Report").  The Guidelines impart an "anchoring effect"—a cognitive bias that describes the tendency of individuals to rely too heavily on the first piece of information they receive when making decisions.  *See Why We Tend to Rely Heavily Upon the First Piece of Information We Receive*, The Decision Lab, *available at* https://tinyurl.com/y6r7p5mm.  Although the difference between the average guideline minimum and the average sentence imposed (where a lower sentence was imposed than the guideline minimum) has widened overall in recent years, the guideline minimum and sentences have also increased, which "suggests the relationship between the guideline minimum and sentence for economic offenses may be stabilizing despite the widening gap" following the *Booker* and *Gall* decisions.  Commission Report at 31.

The guidelines that the Commission set for fraud sentences did not, and to this day do not, accurately reflect past practice or empirical data.  They also have increasingly little connection to actual current sentencing practice, in which downward variances are now the norm within this Circuit in cases under the same Guidelines and offender characteristics at issue here.  Accordingly, they are not a useful guide for sentencing in this case for the reasons explained below.

## A.     The Guidelines grossly exaggerate the length of pre-Guidelines sentences.

The Sentencing Commission sought to replicate past sentencing practice by "drawing on a detailed analysis of 10,500 cases sentenced in the federal courts and on consideration of a less-detailed compilation of nearly one hundred thousand additional cases."  Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts*, 59 (1998).

The Commission used past sentences for two purposes.  First, "to determine the overall severity level of Guidelines sentences"; meaning, to determine what sentences to recommend for particular categories of crimes.  *Id.* (citing U.S. Sentencing Commission, *Sentencing Guidelines –*

*Revised Draft*, January 1987, 16-18). Second, to determine what factors should be used to distinguish between different instances of the same crime; for example, what should make one fraud sentence lower than another. *Id.* But in fact, the Commission's study was fatally flawed in its efforts to accomplish both purposes because it grossly exaggerated the length of past sentences and failed to determine the facts that judges actually relied upon in arriving at those past sentences.

The Commission's study grossly exaggerated the length of pre-Guidelines sentences by ignoring the effect of the abolition of parole. Sentences handed down in the pre-Guidelines era, before the enactment of the Sentencing Reform Act, were imposed in a system that included parole. And under that system federal prisoners "served only 47 percent of their nominal sentences on average." *Id.* at 63. In other words, their actual prison time served was reduced by 53 percent from the sentence imposed. But the Sentencing Reform Act abolished parole, and the maximum "good time" allowance a prisoner can receive is a 15 percent reduction of their sentence. Thus, by ignoring the effect of this change, Guidelines sentences raised the time that the average offender actually spent in prison by 38 percent.[8]

The Commission's study also suffered from a basic flaw in the sources it used to collect data. It did not examine court records of actual judgments entered by judges, or transcripts, to see what facts judges actually relied on in imposing a sentence. Instead, "[t]he Commission simply correlated the mention of particular facts in the presentence report (such as whether the defendant used a weapon, the nature of his role in the offense, the amount of harm caused, etc.) with the sentence ultimately imposed." *Id.* at 61 (footnote omitted). For that reason, one cannot assume that the Guidelines' weighting of particular factors accurately reflects past sentencing practice.

---

[8] Defendants convicted of fraud fared only a little worse than prisoners overall; they served approximately 54 percent of their sentences on average, meaning that their actual prison time was reduced by 46 percent from the sentence imposed. Thus, by ignoring the effect of the elimination of parole on fraud sentences the Guidelines raised the time that the average offender actually spent in prison by 31 percent. *Id.* at 63.

### B. The Loss Table is not based on empirical data.

Moreover, the fraud guideline does not even purport to be based on empirical data of past practice. When the Commission adopted the original Guidelines in 1987, it "decided to abandon the touchstone of prior past practice" with respect to white collar offenses specifically. Breyer, *supra*, 17 Hofstra L. Rev. at 22-23. Before the Guidelines were issued, probation was the norm for white collar offenses, but the Commission's then-mandatory rules required prison for all but the most minor cases. U.S.S.G., Ch. 1, pt. A(4)(d) (1987). And in the years since the Guidelines were adopted, the Commission has made the loss tables significantly more punitive for higher loss amounts like those at issue here. As Boss/Kapp notes, "[T]he Commission's initial deviations from the empirical data, and the resulting Guideline ranges, were modest in comparison to the distortions caused by subsequent amendments. Specifically, since the initial loss Guideline was promulgated, there have been three significant amendments that dramatically increased the severity of the loss table." Boss/Kapp at 610. These amendments not only extended the number of loss brackets; they also increased the degree of enhancement of the base sentence for each bracket, with the higher loss brackets receiving disproportionately higher increases. The result is a loss table today that is "untethered from any empirical grounding" and "prescribes unprecedented multi-decade sentences for the relatively few defendants convicted of crimes that caused losses in excess of ten million dollars—sentences longer than those customarily imposed on bank robbers and even murderers." *Id.* For example, a $1,000,000 loss that resulted in a nine-level enhancement when the table was implemented grew to an 11-level enhancement in 1989, and a 16-level enhancement in 2001.

At the same time, the actual harm from such a loss amount has dropped because of inflation. The U.S. Labor Department's Consumer Price Index estimates that the $129,506,992 loss amount in January 2018 dollars would have been approximately $58.1 million in January 1987 dollars. *See*

CPI Inflation Calculator, https://data.bls.gov/cgi-bin/cpicalc.pl. In other words, the same loss figure causes less than half the economic damage that it did when the Guidelines were issued, but now yields a significantly longer prison term.

The increases in the enhancements for the loss amounts is "rooted in an assumption that larger loss frauds tend to be more sophisticated, affect a larger number of victims, result in greater illicit gains, and involve an abuse of one's position of power." Boss/Kapp at 616. However, Section 2B1.1 includes additional enhancements specifically directed towards such facts (including those applied here for the size of loss, number of victims, and sophistication of means), effectively penalizing a defendant twice for the same conduct. For example, the current loss table carries enhancements up to 30 levels for loss amounts greater than $550 million, which results in a *minimum* guideline range of 210-262 months' imprisonment for a first-time offender, without accounting for any additional enhancements that may be applicable.

Prior to the most recent amendments to the Guidelines in 2015, the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes—a group composed of judges, practitioners, professors, and observers from the Department of Justice and Federal Offenders, observed that

> first-time, non-violent offenders convicted of economic crimes will often face Guidelines' ranges equivalent to those of serious violent offenders. *Compare* USSG § 2B1.1 (2012) (total offense level of 32 considering a base offense level of 6 and loss amount of $100 million) *with* USSG § 2A1.3 (offense level of 29 for voluntary manslaughter); USSG § 2A2.1 (offense level of 33 for assault with intent to murder); USSG § 2A3.1 (offense level of 30 for criminal sexual abuse); USSG § 2A4.1 (offense level of 32 for kidnapping or abduction); USSG § 2A6.2 (offense level of 18 for domestic violence).

*See* Erin C. Dougherty, *ABA Task Force Proposes Significant Change to Fraud Guidelines*, *available at* https://tinyurl.com/4c9v37a8. Despite the urging of courts, academics, and practitioners, the Commission did not rectify problems with the loss table during the last

amendment cycle. The Chair of the ABA's Criminal Justice Section later lamented that "history will reveal this period of our nation's history as a time of a failed experiment with the imprisonment of first-time nonviolent offenders for periods of time previously reserved only for those who had killed someone." *See* James E. Felman, *Reflections on the United States Sentencing Commission's 2015 Amendments to the Economic Crimes Guideline*, Fed. Sent'g Rep., Vol. 27, No. 5 288-92, 288 (June 2015), *available at* https://tinyurl.com/y74v7mv3.

Taken together, these flaws undermine the Commission's claim that the Guidelines derive from past experience, and thus undermine the central justification for the Guidelines' methods and recommendations.

### C. The Guidelines do not accurately reflect current fraud sentencing practice.

Even now, after judges have been applying the Guidelines for almost three decades, a sentence based on the fraud Guideline does not accurately reflect actual sentences in fraud cases, which have increasingly diverged from the Guidelines in recent years in part due to the draconian loss table under Section 2B1.1.

Many judges in this Circuit and elsewhere have severely criticized Section 2B1.1's loss table and recognized that a significant downward variance from the Guideline range is appropriate for first-time nonviolent offenders. *See, e.g.*, *United States v. Corsey*, 723 F.3d 366, 380 (3d Cir. 2013 (J. Underhill, concurring) ("the loss guideline [is] fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges."), Transcript of Proceedings re: Sentencing held on 6/14/17 at 28, *United States v. Lumiere*, No. 16-cr-00483 (S.D.N.Y. June 14, 2017), ECF No. 115 (Rakoff, J.) ("Ridiculous, absurd, barbaric" and "bear[ing] no relationship" to "any of the factors set forth in Section 3553(a)."); *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2013) (Rakoff, J.) (varying from the Guidelines because they place an "inordinate emphasis . . . on the amount of

actual or intended financial loss"); *United States v. Johnson*, No. 16-Cr.-457-1 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. April 27, 2018) (Garaufis, J.) ("As far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime."); *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (Block, J.) (A "black stain on common sense").

The actual average and median sentences under the relevant Guidelines section here, Section 2B1.1, are a fraction of the advised Guidelines sentence for David. For example, between fiscal years 2015 and 2020,[9] courts in the Second Circuit sentenced defendants under Section 2B1.1 who, like David, were in Criminal History Category I and Zone D of the Sentencing Table,[10] to sentences with an average imprisonment length of 27 months, with a median imprisonment length of 18 months, representing a population of 1,429 defendants sentenced to a term of incarceration. *See* U.S. Sentencing Commission, Interactive Data Analyzer, https://tinyurl.com/mst97e54. If we expand that analysis to all circuits, between fiscal years 2015 and 2020, the average sentence for criminal history category I under Section 2B1.1 was 36 months and the median sentence was 27 months, out of a population of 12,357 defendants sentenced to a term of incarceration.

Moreover, courts within this Circuit have increasingly used downward variances to sentence defendants similarly situated to David. In fiscal year 2015, courts within this Circuit employed a downward variance in cases under the Section 2B1.1 Guideline for offenders with a

---

[9] This memorandum focuses on fiscal years 2015-2020 because that is the maximum available time range of data available for analysis using the Sentencing Commission's Interactive Data Analyzer tool.

[10] Zone D of the Sentencing Table covers a vast range of offense levels, from level 14 (recommended sentence of 15-21 months) to level 43 (recommended sentence of life in prison, calculated as 470 months for purposes of the Sentencing Commission's data analytics).

Criminal History Category of I in 44.6 percent of cases (and, conversely, issued a sentence following the Guidelines in 55.4 percent of cases). *See id.* As of fiscal year 2019, Courts within this Circuit employed a downward variance in the *majority* of such cases (55.4 percent), rising to 58 percent in fiscal year 2020, the last reported period. *See id.* Moreover, the overwhelming majority of such variances for all such time periods were not based on motions by the Government. *See id.* (reflecting that government motions accounted for approximately 7 percent of such downward variances in fiscal year 2015, approximately 10 percent in fiscal year 2016, approximately 12 percent in fiscal year 2017, approximately 13 percent in fiscal year 2018, and approximately 16 percent in fiscal years 2019 and 2020).

The impact of such downward variances has been very significant in fraud cases. Based on detailed data published by the Sentencing Commission for fiscal year 2020, in fraud cases where downward variances were employed, such variances resulted in a mean percentage decrease versus the applicable Guideline range of 58.5 percent and a median percentage decrease versus the applicable Guideline range of 51.6 percent. Examples from this district include:

- In *United States v. Caspersen*, a Ponzi scheme that resulted in an over-$45,000,000 loss amount, Judge Rakoff employed an 11-year downward variance. *See* Transcript of Proceedings re: Sentencing held on 11/4/16 at 82, *United States v. Caspersen*, No. 1:16-cr-00414 (S.D.N.Y.) ECF No. 37

- In *United States v. Cooney*, Judge Abrams sentenced a defendant who was convicted after trial of defrauding a Native American tribal entity and various investment advisory clients of tens of millions of dollars, and who had a Guideline range of 135-168 months, to 30 months' imprisonment. *See* Transcript of Proceedings re: Sentencing held on 7/31/2019 at 44, *United States v. Cooney*, No. 1:16-cr-00371 (S.D.N.Y.) ECF No. 801.

- In *United States v. Block,* Judge Oetken sentenced a defendant convicted after trial of a $315,000,000 securities fraud, who had a Guideline range of life in prison and a Probation Department recommendation of 84 months' imprisonment, to 18 months. *See* Transcript of Proceedings re: Sentencing held on 11/8/17 at 72, *United States v. Block*, No. 1:16-cr-00595 (S.D.N.Y.) ECF No. 169.

- In *United States v. Lumiere*, Judge Rakoff sentenced the defendant convicted of conspiracy to commit securities fraud with a Guideline range of 135-168 months to 18 months' imprisonment. *See* Transcript of Proceedings re: Sentencing held on 6/14/17 at 28, *United States v. Lumiere*, No. 16-cr-00483 (S.D.N.Y. June 14, 2017), ECF No. 115.

- In *United States v. Hamid Ahkavan and Ruben Weingand*, Judge Rakoff sentenced two defendants who were convicted after trial of a purported $150 million wire fraud, to 30 months and 15 months where the Guideline ranges were life in prison and 235-293 months, respectively. *See* Transcript of Proceedings re: Sentencing held on 06/18/2021 at 27, *United States v. Weigand*, No. 1:20-cr-00188 (S.D.N.Y.) ECF No. 326; Transcript of Proceedings re: Sentencing held on 06/18/2021 at 28, *United States v. Weigand*, No. 1:20-cr-00188 (S.D.N.Y.) ECF No. 328.

- In *United States v. Behiry*, Judge Schofield sentenced a physical therapist who was convicted after trial of five counts of mail fraud, wire fraud, and healthcare fraud related to his participation in a $30 million scheme to defraud Medicare and the New York State Medicaid Program, and who had a Guideline range of 135-168 months, to 24 months in prison. *See* Transcript of Proceedings re: Sentencing held on 10/6/2020 at 43, *United States v. Vaid*, No. 1:16-cr-00763 (S.D.N.Y.) ECF No. 793.

- In *United States v. Worrall*, Judge Kaplan varied from a Guideline range of 78-97 months and imposed a sentence of 20 months on a government employee who was convicted after trial of insider trading after stealing confidential information from the Centers for Medicare and Medicaid Services. *See* Transcript of Proceedings re: Sentencing held on 9/13/2018 at 72, *United States v. Blaszczak*, No. 1:17-cr-00357 (S.D.N.Y.) ECF No. 412.

In other words, there is no reason—whether based on history or the actual practice in the federal judiciary—to presume that the Guidelines provide useful guidance in fraud cases such as this one. When the Commission formulated guidelines for white collar offenses, it departed from "empirical data and national experience," and in so doing it departed from its "characteristic institutional role." *Kimbrough v. United States*, 552 U.S. 85, 109 (2007). In the years since 1987, the Loss Table has only become more distorted by the effects of inflation; the recommended punishment for many loss amounts has effectively doubled. And finally, the Commission's own data shows that the fraud guidelines in particular continue to recommend sentences far above the sentences that are actually imposed in most cases.

34

**D. Imposing a sentence influenced by the Guidelines would be inappropriate here.**

In this context, to impose a Guidelines sentence on David—or one substantially influenced by the Guidelines—would be to create a serious sentencing disparity and an unjust result. The disproportionate enhancements in Section 2B1.1's loss table and the anchoring effects of the Guidelines have particularly severe consequences here. Over 63 percent of David's total offense level stems from the 24-level enhancement from the stipulated loss figure of approximately $129.5 million, which does not account for the value of the investment advisory services IIG actually rendered or the small fraction of that amount that David personally received, as discussed in Section I.B., *supra*. Moreover, it reflects the gradual creep of higher and higher sentences for fraud cases without any empirical basis and despite inflation, rising from what would have been an 11-level increase for the loss amount here under the 1987 Guidelines to a 24-level increase under the 2018 Guidelines based on the loss amount alone. The Guidelines calculation David stipulated to in his plea agreement may be correct, but the resultant offense level of 38 (including the three-point reduction pursuant to his guilty plea) and Stipulated Guidelines Range of 235 to 293 months—which exceeds those for many violent crimes by repeat offenders—is overly punitive for a first-time, non-violent offender, even before consideration of the Section 3553(a) sentencing factors discussed in Section I., *supra*.

## CONCLUSION

In these circumstances, the Guidelines are too blunt an instrument and the sentencing range they advise does not appropriately calculate the need for the sentence imposed. For crimes such as David's, the Guidelines have become unmoored from what is sufficient but not greater than necessary to achieve the purposes of Section 3553(a). Our recommended sentence would reflect the seriousness of the offense, provide adequate general and specific deterrence, reflect public

safety concerns, and recognize that David has already paid—and will continue to pay—an incredibly high price for the mistakes that he has made.  Given the circumstances of this case, a sentence of 60 months is a reasonable variance.  For the foregoing reasons, we respectfully request that the Court impose a sentence of not greater than 60 months' imprisonment.

Dated:  April 4, 2022                          Respectfully submitted,
New York, New York


                                               /s/ Howard Schiffman

                                               Howard Schiffman
                                               Jason T. Mitchell

                                               SCHULTE ROTH & ZABEL LLP
                                               919 Third Avenue
                                               New York, New York  10022

                                               Barry A. Bohrer

                                               MINTZ, LEVIN, COHN, FERRIS,
                                               GLOVSKY, AND POPEO, P.C.
                                               Chrysler Center
                                               666 Third Avenue
                                               New York, New York  10017


                                               *Attorneys for David Hu*