UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -- - - - - - - - - - - - - - - -  x

                                        :

UNITED STATES OF AMERICA            :

                                          :

            - v. -               :       20 Cr. 360 (AKH)

                                          :

DAVID HU,                         :

                                          :

                                          :

                   Defendant.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

 

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Negar Tekeei
Drew Skinner
Alex Rossmiller

Assistant United States Attorneys
  - Of Counsel –

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ...................................................... 2

   I.    Summary of Offense Conduct ........................................................................................ 2

   II.   Procedural History .......................................................................................................... 9

   III.  Presentence Investigation Report................................................................................... 10

DISCUSSION ............................................................................................................................. 11

   I.    The Nature and Seriousness of the Defendant's Criminal Conduct and the Need for Just Punishment Warrant a Substantial Sentence of Imprisonment........................................ 12

   II.   A Substantial Sentence of Incarceration Would Reflect the Defendant's History and Characteristics, Afford Adequate Deterrence, and Promote Respect for the Law. .......... 15

   III.  The Sentencing Guidelines Loss Enhancement is Appropriately Considered in Connection with Sentencing. ........................................................................................ 17

   IV.  A Substantial Sentence of Imprisonment is Necessary to Avoid Unwarranted Sentencing Disparities. .................................................................................................... 18

   V.   The Defendant Did Not Provide "Substantial Assistance" to the Government................ 19

   VI.  The Defendant's Family Ties and Personal History Do Not Support the Substantially Below-Guidelines Sentence He Seeks. .......................................................................... 20

CONCLUSION........................................................................................................................... 22

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in advance of the sentencing of defendant David Hu, who pleaded guilty in this case to conspiracy to commit investment adviser fraud, securities fraud, and wire fraud for his role as a leader in a scheme to defraud clients and investors of the investment advisory firm International Investment Group ("IIG"), over which he served as the managing partner.  For more than 10 years, the defendant, working with others, devised and executed a sophisticated and fraudulent scheme designed to hide losses in IIG funds by, among other things, overvaluing trade finance loans, creating fictitious loans, selling overvalued and fake loans, and using proceeds from those fraudulent sales to generate liquidity required to pay off earlier investors in a Ponzi-like manner.  The victims, including retail mutual fund investors, who lost millions of dollars because of the defendant's fraudulent actions will suffer the effects of the defendant's fraud for years to come.  The defendant must be sentenced to a lengthy term in prison to reflect the gravity of his crimes, to promote respect for the law, to deter him from reoffending again, and to deter others from emulating his misdeeds.

The parties and the United States Probation Department agree that the advisory Sentencing Guidelines range applicable to the defendant's conduct is 235 to 293 months' imprisonment.  PSR ¶ 91.[1]  The Probation Department has recommended a below-Guidelines sentence of 180 months, or 15 years, of imprisonment.  For the reasons explained below, the Government respectfully submits that a substantial sentence of imprisonment, below the applicable Guidelines range but consistent with the sentence recommended by the Probation Department, is both necessary and appropriate to adequately punish the defendant for his misconduct in this case.

---

[1] "PSR" refers to the Probation Department's Final Presentence Investigation Report dated April 21, 2021, and "Dkt." refers to docket entries in this case, unless otherwise noted.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

**I.   Summary of Offense Conduct**

### A.  Background Regarding IIG and the Defendant

The defendant co-founded the International Investment Group, LLC ("IIG") with his co-defendant, Martin Silver, in 1994.  PSR ¶ 12.  IIG was a New Jersey limited liability company founded in 1994 with its principal place of business in New York, New York.  *Id.* ¶ 11.  IIG provided investment management and advisory services, including for three private funds that it operated: (1) the IIG Trade Opportunities Fund N.V. ("TOF"); (2) the IIG Global Trade Finance Fund, Ltd. ("GTFF"); and (3) the IIG Structured Trade Finance Fund, Ltd. ("STFF").  *Id.*  IIG also advised the Venezuela Recovery Fund ("VRF"), a fund that managed the remaining assets of a failed Venezuelan bank whose liquidation was overseen by the Central Bank of Curacao (VRF, together with TOF, GTFF, and STEF, the "IIG Funds").  *Id.*  In March 2018, IIG reported to the SEC that it had approximately $373 million in assets under management.  *Id.*

The defendant was a Managing Partner and the Chief Investment Officer of IIG, and Silver was a Managing Partner and the Chief Operating Officer of IIG.  *Id.* ¶ 12.

### B.  Background Regarding IIG's Trade Finance Loans

IIG advertised itself as a specialty finance group involved in the financing of global trade transactions and specializing in providing customized financing solutions to small and medium-sized merchants, traders, and processors through trade finance loans.  *Id.* ¶ 12.  IIG's principal investment advisory strategy, including with respect to the IIG Funds, was investing in trade finance loans that it originated.  *Id.*

Trade finance loans are used by small and medium-sized companies, typically exporters and importers, to facilitate international trade and commerce.  *Id.* ¶ 13.  IIG's purported expertise

was in trade finance loans to borrowers located in Central or South America, and in a variety of industries, with a stated focus on "soft commodities," such as coffee; agriculture; aquaculture, such as fishing; and other food products. *Id.* IIG's trade finance loans were purportedly secured by collateral, such as the underlying traded goods, assets held by the borrowers, or expected payments by third parties. *Id.*

Investments in TOF, STFF, and GTFF were marketed to institutional investors, such as pension funds, hedge funds, and insurers. *Id.* ¶ 14. In offering memoranda and communications with investors, IIG advertised strict risk controls, such as promises to use diligence to carefully select borrowers or issuers with trusted management and marketable assets, and portfolio concentration limits based on borrower, developing country, and industry. *Id.* IIG purported to value the trade finance loans in the IIG Funds on a regular basis. IIG and, in turn, the defendant received a performance fee with respect to the IIG Funds, as well as a management fee, which was calculated as a percentage of the assets under management held in the Funds. *Id.*

## C. The Fraudulent Scheme and Conduct

From approximately 2007 through 2019, the defendant conspired to defraud investors in IIG-managed funds by (i) overvaluing distressed loans in the IIG Funds, (ii) falsifying paperwork to create a series of fake loans that they classified, fraudulently, as positively performing loans, and to otherwise hide losses, (iii) selling overvalued and fake loans to a collateralized loan obligation trust and new private funds established and advised by IIG, and (iv) using the proceeds from those fraudulent sales to generate liquidity required to pay off earlier investors in a Ponzi-like manner. *Id.* ¶ 15.

1. **The defendant and Silver overvalue assets and created fake loans in order to hide losses in TOF.**

From approximately in or about 2007 through in or about 2019, the defendant and Silver engaged in multiple deceptive and fraudulent practices designed to conceal the true value of the IIG Funds from investors so that IIG – and Hu and Silver – could continue to collect management and performance fees.  *Id.* ¶ 16.  For example:

- The defendant and Silver systematically caused IIG to mismark the value of multiple loans that had, in reality, defaulted (the "Defaulted Loans").  Instead of acknowledging the defaulted status of these loans, the defendant and Silver instead caused IIG to mark the Defaulted Loans at par plus accrued interest, even though the defendant and Silver knew that the borrowers' default significantly impaired the true value of these loans. The defendant and Silver certified these false valuations and caused them to be reported to investors.  *Id.* ¶ 16.

- The defendant and Silver systematically caused IIG to mismark multiple loans that were distressed (the "Distressed Loans").  These Distressed Loans included, for example, loans for which the borrowers had missed multiple scheduled payments. Even though the defendant and Silver knew that the non-performing status of the loans significantly impaired their true value, they nevertheless caused IIG to continue to mark the loans at par plus accrued interest.  *Id.* ¶ 17.

- With respect to TOF specifically, in order to hide the losses resulting from the Defaulted Loans, including from auditors reviewing TOF's financials, the defendant and Silver removed the Defaulted Loans from the TOF portfolio, replacing them with tens of millions of dollars in fictitious loans to purported borrowers in foreign countries (the "Fake Loans").  The defendant and Silver also created or directed the creation of documents to keep in IIG's files as purported documentation of the Fake Loans.  For many of the Fake Loans, IIG's files contained promissory notes, but no additional loan documentation or due diligence files.  To pass auditor scrutiny, the defendant and Silver also directed purported borrowers – sham foreign entities that were controlled by IIG's business associates and that did not engage in actual business – to provide confirmations of the Fake Loans to auditors, including by arranging for TOF to pay a monthly fee to one purported borrower in exchange for providing false confirmations. In reality, these purported borrowers did not receive a loan from TOF, and were not expected to make any payments to TOF.  *Id.* ¶ 18.

As a result of actions taken by the defendant and Silver, to overvalue assets and hide losses in the TOF portfolio, TOF's stated value was fraudulently inflated, and this inflated value enabled IIG, and, in turn, the defendant and Silver, to receive management and performance fees to which they were not entitled.  *Id.* ¶ 19.

### 2. The defendant and Silver advance their scheme through transactions with a Central American Bank and VRF.

In or about 2010, the defendant and Silver caused TOF to acquire shares of Girobank, a Central American bank.  *Id.* ¶ 20.  TOF purchased shares of Girobank in part by selling loans held by TOF, including Distressed, Defaulted, and/or Fake Loans, to generate cash proceeds that were provided to individuals and/or entities selling their shares of Girobank.  *Id.*  After causing TOF to acquire shares of Girobank in this manner, the defendant and Silver were named to Girobank's Board of Supervisory Directors.  *Id.*  Subsequently, the defendant and Silver caused Girobank, through an intermediary entity, to purchase interests in loans, including Defaulted Loans, Distressed Loans, and/or Fake Loans, held by IIG funds in order to generate liquidity for IIG funds. *Id.*

The defendant and Hu also caused VRF to invest in trade finance loans, including from some of the same borrowers for TOF's Defaulted Loans and Distressed Loans.  *Id.* ¶ 21.  As described above, the defendant and Silver systematically caused IIG to overvalue Distressed Loans in VRF.  *Id.*  In approximately 2015, IIG ceased its role as investment adviser for VRF, but the defendant remained the sole director of VRF.  *Id.*  Beginning in or around early 2017, the defendant and Silver spearheaded an effort to cause IIG's Trade Finance Trust ("TFT"), a special purpose vehicle designed to originate and be the lender of record for IIG-originated trade finance loans, to purchase loans from VRF's portfolio, including Defaulted or Distressed Loans, for approximately $6.3 million.  *Id.*  The defendant and Silver then caused TFT to transfer the loans to STFF, where

they continued to overvalue the loans, generating increased management and performance fees for IIG.  *Id.*

### 3.  The defendant and Silver securitized loans in the TOF portfolio, hiding losses and defrauding new investors.

In or about 2014, the defendant and Silver obtained approximately $220 million in bank financing to create a collateralized loan obligation trust (the "CLO Trust"), for which IIG served as an investment adviser.  *Id.* ¶ 22.  The defendant and Silver then engaged in various deceptive acts, using the CLO Trust, to hide TOF's losses and generate liquidity for TOF, which was facing investor redemption requests and demands for repayment of loans that IIG had taken from international development banks.  *Id.*

For example, in its capacity as investment adviser for the CLO Trust, IIG, through the efforts of the defendant and Silver, caused the newly-created CLO Trust to purchase loans from the TOF portfolio, including Defaulted Loans, Distressed Loans, and Fake Loans, which generated liquidity for TOF.  *Id.* ¶ 23.  After the CLO Trust purchased loans in the TOF portfolio, IIG, through the efforts of the defendant and Silver, generated additional liquidity by causing the CLO Trust to issue securitized debt instruments based on these loans, payable in various tranches to investors in the CLO Trust.  *Id.*

Through the defendant's and Silver's efforts, IIG also caused the CLO Trust to create new fraudulent trade finance loans, and used those new fraudulent loans to cover up TOF's losses.  *Id.* ¶ 24.  Specifically, the defendant caused the creation of shell entities domiciled in Panama ("Panamanian Shell Entities") that were controlled by an IIG nominee.  *Id.*  Then, the defendant caused the CLO Trust to enter into fake loan transactions with the Panamanian Shell Entities.  The defendant caused the creation of fake promissory notes and other paperwork to conceal the fraudulent nature of the loans to the Panamanian Shell Entities.  *Id.*  Finally, under the guise of the

fake loan transactions with the Panamanian Shell Entities, the CLO Trust disbursed funds that the defendant and Silver diverted to TOF in order to pay off TOF's various debts and obligations. *Id.*

**4. The defendant and Silver create new funds to further conceal the fraud.**

In 2017, the defendant and Silver worked with a foreign institutional investor, Lime Asset Management Co. ("Lime"), an asset manager based in South Korea and representing Shinhan Bank customers, that raised money for two new private IIG managed funds: GTFF and STFF. *Id.* ¶ 25. Lime provided $70 million as the seed investment for GTFF, and, later, $130 million as the seed investment for STFF. *Id.* Using funds from Lime and other investors in GTFF, the defendant and Silver caused GTFF to purchase (a) assets from TOF and the CLO Trust, including more than $40 million in TOF's Fake Loans and the CLO Trust's fraudulent loans, and (b) approximately $28 million in Distressed and Defaulted Loans made by the CLO Trust to an Argentine entity, Vicentin, including loan obligations that were the subject of disputes between IIG and the Argentine Borrower, without disclosing the true nature of the loans or the fact of the disputes to GTFF's investors. *Id.*

Similarly, using funds from Lime, the defendant and Silver caused STFF to purchase (a) assets from TOF and the CLO Trust, including more than $10 million in TOF's Fake Loans and the CLO Trust's fraudulent loans, and (b) approximately $25 million in Distressed and Defaulted Loans made by the CLO Trust to the Argentine Borrower, the status of which were in dispute, without disclosing the true nature of the loans or the fact of the dispute to STFF's investors. *Id.* ¶ 26.

**5. The defendant conceals a $6 million loss in a retail fund advised by IIG.**

In or about December 2012, IIG, controlled by the defendant and Silver, became an investment adviser to an open-ended mutual fund marketed to retail investors, the Trilinc Global

Impact Fund ("Trilinc").  *Id.* ¶ 27.  As an investment adviser to Trilinc, IIG made investment recommendations, including recommendations that Trilinc invest in trade finance loans originated by IIG.  *Id.*  On IIG's recommendation, Trilinc invested in loans to Vicentin.  *Id.*  In or about February 2017, Vicentin failed to pay the principal on an approximately $6 million loan ("Loan-1") in which Trilinc had invested and which was nearing its maturity date.  *Id.*  In order to ensure further investments by Trilinc into IIG-originated loans, including additional investments in loans made to Vicentin, the defendant took steps to conceal the default by Vicentin in Loan-1.  *Id.*

For example, in or about March 2017, the defendant caused approximately $6 million to be transferred into an account associated with Vicentin from the account of a different borrower ("Borrower-1"), and further directed the funds from Borrower-1's account to pay off the debt owed by Vicentin to Trilinc.  *Id.* ¶ 28.  23.  To replace the funds from Borrower-1's account that were used to make it appear as though Vicentin had resolved its debt to the Retail Fund, the defendant fraudulently induced Hu to invest in a new, fake $6 million loan to the Argentine Borrower (the "New Loan").  *Id.*  The defendant then directed that the proceeds from the fraudulently induced New Loan be transferred into Borrower-1's account, effectively reimbursing the account for the earlier $6 million transfer to the Retail Fund.  *Id.*  To further conceal the fraudulent nature of the New Loan, the defendant caused the creation of forged documents to make it appear as though the New Loan was a legitimate loan to Vicentin.  *Id.*

In late 2017, representatives of Trilinc raised concerns with the defendant about the status of Vicentin, and status of the loan assets that were related to Vicentin.  *Id.* ¶ 29.  In communications with Trilinc about Vicentin and loan assets associated with Vicentin, the defendant repeatedly failed to disclose the fraudulent nature of the New Loan.  *Id.*  Trilinc ultimately lost the $6 million it invested in the New Loan.  *Id.*

## II.    Procedural History

After becoming aware of the Government's investigation and more than a year after he had been aware of a parallel investigation by the United States Securities & Exchange Commission (the "SEC") the defendant met with the Government on three occasions in August and September 2019 for interviews pursuant to a proffer agreement.  After meeting with the defendant and considering his proffer statements against the backdrop of the investigation and information obtained through records and other sources, the Government determined that the defendant could not provide substantial assistance in the investigation and prosecution of others.  Therefore, the Government did not continue to meet with the defendant or offer him a cooperation agreement.

On July 17, 2020, with the defendant's consent, an Information was filed, charging the defendant with conspiracy to commit investment adviser fraud (Count One), committing securities fraud (Count Two), and wire fraud (Count Three), in connection with the scheme to defraud investors in IIG-managed funds by (i) overvaluing distressed loans in the IIG Funds, (ii) falsifying paperwork to create a series of fake loans that they classified, fraudulently, as positively performing loans, and to otherwise hide losses, (iii) selling overvalued and fake loans to a collateralized loan obligation trust and new private funds established and advised by IIG, and (iv) using the proceeds from those fraudulent sales to generate liquidity required to pay off earlier investors in a Ponzi-like manner.

On January 28, 2021, the defendant pled guilty before this Court, pursuant to a plea agreement, to Counts One, Two, and Three of the Information.  During the plea proceeding, the defendant admitted his conduct, stating:

> From approximately 2007 through 2019, in New York City and elsewhere, together with another person identified in the Information as co-conspirator 1, and while acting as an investment advisor, I intentionally and knowingly participated in a scheme to overvalue distressed loans in IIG funds, falsified paperwork to

9

create a series of fake loans, sell overvalued and fake loans to a collateralized loan obligation trust, and used the proceeds from those sales to pay off earlier investors. Through these and other actions using interstate wires and the mail, I concealed the true value of IIG funds from investors and transferred fake and overvalued loans between funds, [to] which I provided investment advisory services, in order to receive for ourselves management and performance fees to which we were not entitled. I engaged in this conduct in connection with the purchase and sale of securities, including the retail mutual fund, IIG advised funds, and securities issued by the CLO Trust.

Dkt. 34 at 20-21.

## III.    Presentence Investigation Report

The Probation Office, consistent with the plea agreement pursuant to which the defendant pleaded guilty in this case, calculates that the defendant has a total Guidelines offense level of 38, which includes: a 24-level enhancement because the losses were estimated to amount between $65 million and $150 million, pursuant to U.S.S.G. § 2B1.1(b)(1)(M); a two-level increase because the offense involved 10 or more victims, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i); a two-level increase because a substantial part of the fraudulent scheme was committed from outside the United States, and because the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(10)(B) and (C); a four-level increase because the offense involved a violation of securities law and, at the time of the offence, the defendant was an investment adviser, pursuant to U.S.S.G. § 2B1.1(b)(20)(A)(iii); and a two-level enhancement based on the defendant's role as an organizer, leader, manager, and supervisor of the charged criminal activity, pursuant to U.S.S.G. § 3B1.1(c).  PSR ¶¶ 40-54.  The defendant has no criminal history points, and his criminal history category is I.  Accordingly, based on a total offense level of 38 and a criminal history category of I, the defendant's Guidelines range is 235 to 293 months' imprisonment (roughly 19 to 24 years).

After interviewing the defendant and his son, and preparing its final presentence investigation report for this case, the Probation Department recommends that the Court impose a sentence of 180 months, or 15 years, of imprisonment on the defendant.  PSR at 30.  In making its recommendation, the Probation Department observed that the defendant appeared to have been "motivated by financial gain," and considered the defendant's "leadership role in a securities and wire fraud scheme which was perpetrated over a 12-year period" and resulted in significant losses to a myriad of victims.  The Probation Department's recommendation of a downward variance from the applicable Guidelines sentencing range of approximately 19 to 24 years to a sentence of 15 years of imprisonment was made after considering all of the relevant factors — including the defendant's role, lack of prior criminal history, his personal and medical history, statements made by his counsel and his son, and the need to provide for adequate punishment and deterrence from future behavior.  *Id.* at 31.

## DISCUSSION

Based on the facts set forth above, this Court should sentence the defendant to a substantial term of imprisonment, consistent with the Probation Department's recommendation of 15 years of imprisonment, in order to meet the goals of sentencing enumerated by Congress in Title 18, United States Code, Section 3553(a).  Several of the factors that sentencing courts must consider under Section 3553(a), in addition to the advisory Guidelines, call for such a sentence for the defendant. The Section 3553(a) factors applicable here include the need for the sentence imposed to reflect the seriousness of the defendant's offense conduct, to promote respect for the law, to provide just punishment, to account for the defendant's history and characteristics, to afford adequate deterrence to the defendant and other similarly situated individuals, and to protect the public from further crimes by the defendant.  The defendant seeks a term of 60 months' imprisonment, which is a substantial downward variance from the agreed-upon Guidelines range of 235 to 293 months'

11

imprisonment.  But a sentence of only five years or anything near it would be wholly insufficient to serve the purposes of sentencing in light of the gravity of the offense and the need to achieve general deterrence in a sector of the financial services industry that is badly in need of policing. Rather, the Government respectfully submits that, in consideration of the defendant's age, medical history, and attempts to provide assistance to the Government, the Court should grant a downward variance from the applicable Guidelines range of 235 to 293 months' imprisonment, but that extent of such a downward variance should be no more than what is recommended by the Probation Department in order to adequately account for the nature and seriousness of the defendant's criminal conduct, and the need for just punishment and deterrence.

## I.   The Nature and Seriousness of the Defendant's Criminal Conduct and the Need for Just Punishment Warrant a Substantial Sentence of Imprisonment.

The nature and seriousness of defendant's brazenly fraudulent offense conduct and the need to impose just punishment weigh decidedly in favor of a substantial sentence of incarceration. *See* 18 U.S.C §§ 3553(a)(1), (a)(2)(A).

Day in and day out, throughout the course of more than a decade, the defendant abandoned his fiduciary responsibilities as an investment adviser and defrauded IIG funds and investors, causing more than a hundred million dollars in losses to those funds and investors.  He purposefully mismarked millions of dollars of loan assets, falsified paperwork to create fake loans, sold overvalued and fake loans and used the proceeds from those sales to pay off early investors, and falsified additional paperwork to deceive auditors and avoid scrutiny.  Over time, the defendant's employees became suspicious and parallel investigations were launched by the SEC and the Government.  Once he realized his scheme had been exposed, and, presumably, recognized his criminal and civil liabilities, the defendant met with the Government and then, ultimately, pled guilty to his crimes.

The Court has by now received and considered letters submitted by multiple victims impacted by the defendant's crimes, and the Government will not quote those statements at length here.  However, a few statements bear emphasizing.  In a March 29, 2022 letter, the Joint Official Liquidators for the winding up proceedings of GTFF and STFF described the impact on the "individual investors, retirees, pension funds, and governmental institutions whose funds were invested in GTFF and STFF," including individual investors who purchased trade finance funds managed by Lime, the largest investor in GTFF:

> Because LIME was a Korean hedge fund, the impact of David Hu's crimes on individuals may not have been immediately visible but should have been known to Mr. Hu. Distributors sold the trade finance funds managed by LIME, which invested in GTFF as well as STFF, to individual domestic investors, many of whom were not wealthy and who have been devastated by IIG's failure as well as subsequent LIME's failure. The impact of David Hu's fraud on such unsophisticated individual investors cannot be measured purely in financial terms, however. Relevant press reports clearly establish that Mr. Hu's criminal activity brought great grief, heartache, frustration and stress to individual investors.

March 29, 2022 Letter from the Joint Official Liquidator at 3-4.  The massive and multifaceted fraudulent scheme that the defendant led and organized caused *real* losses to *real* institutions and individuals who will suffer from the impact of those losses for years to come.

It is troubling that, in his sentencing submission, the defendant attempts to minimize his crimes and their impact by arguing that the funds he infected with overinflated loan values and completely fictitious loans – in order to hide losses and deceive investors into thinking those funds were performing well – also contained legitimate trade finance loans that were performing.  Dkt. 72 at 11, 20-23.  These arguments miss the mark.  The whole point of the defendant's fraudulent scheme was to hide severe losses in the funds he advised to deceive investors into maintaining their investments and not redeeming.  There can be no question that, had the investors been made

aware that the defendant was overinflating the values of underperforming trade finance loans and creating fake loans to cover up losses, they would have immediately sought to redeem their investments notwithstanding whether legitimate and performing loans remained in the funds. Moreover, Hu seeks to place the blame on Silver by stating that he "helped facilitate Silver's plans" to defraud TOF investors.  Dkt. 72 at 11.  But Hu and Silver jointly defrauded IIG's investors. Indeed, it was Hu who was primarily responsible for the entirely fake Panamanian loans.

Nor should the Court be swayed by the fact that the defendant used the fraudulent proceeds of his crimes – including fraudulently induced investment advisory fees – to prop up IIG and its employees (in addition to paying his own salary).  As United States District Judge William H. Pauley III found in rejecting a similar argument by a defendant who pleaded guilty to soliciting millions of dollars in investments in a purported business through securities fraud, the notion that the business was somehow legitimate because the defendant caused the business to spend over a hundred thousand dollars "in legal expenses to keep regulators at bay" and thousands of dollars a month for office space during the fraud "turns the world upside down."  *See United States* v. *Genovese*, 18 Cr. 183 (WHP), Sent'g Hr'g Tr. at 81 (S.D.N.Y.).

The defendant's crime was not merely "a terrible error in judgment" or a "mistake" that he "continued to double down on."  *See* Dkt. 72 at 1.  This sophisticated fraudulent scheme perpetrated for more than a decade and which spanned continents was carefully designed and executed by the defendant and his coconspirators.  That it lasted so long only demonstrates the extreme measures the defendant took to conceal the fraud – falsifying paperwork to create fake loans, selling loans to other funds and the CLO trust to hide losses, and using the proceeds from those fraudulent sales to generate liquidity required to pay off earlier investors in a Ponzi-like

manner.  These facts are not in dispute, and evince a calculated effort deceive investors for personal and professional gain.

Against this backdrop, the impact of harm caused by the defendant, the lies he peddled to investor victims and the damage he caused to funds that he advised, and the nature and seriousness of the offenses in which he participated cannot be ignored and militate in favor of a substantial sentence of incarceration.

## II.    A Substantial Sentence of Incarceration Would Reflect the Defendant's History and Characteristics, Afford Adequate Deterrence, and Promote Respect for the Law.

A substantial sentence of incarceration is also necessary to deter the defendant from yet again returning to fraud as a way of earning income in the future and to deter others contemplating fraud from emulating the defendant's misdeeds.  As described in detail in the PSR and the defendant's sentencing submission, this defendant was afforded incredible advantages that distinguish him from many defendants in other criminal cases: a stable and supporting extended family with substantial resources to support him and his siblings, a loving nuclear family, distinguished educational opportunities and credentials, and a successful beginning to a career in the financial services sector focusing on sophisticated, multi-national trade financing. Notwithstanding these advantages and this strong support system, the defendant chose to perpetrate a scheme involving lies, deceit, knowingly causing substantial financial losses that will impact his victims for years to come.

The Government does not dispute that the defendant has accepted responsibility sufficient to warrant a decrease in his offense level, pursuant to U.S.S.G. §§ 3E1.1(a) and (b), and that the defendant agreed to plead guilty pursuant to an Information and plea agreement relatively quickly, preserving Government resources in this prosecution.  The significant downward variance that the Probation Department recommends and that the Government also believes would be adequate here

acknowledges the defendant's actions and decision to resolve this case quickly.  However, a substantial sentence of imprisonment, consistent with the Probation Department's recommendation, is still necessary to afford adequate deterrence and promote respect for the law. When a defendant perpetrates a more than decade-long scheme to deceive investors and cause more than a hundred million dollars of losses to financial institutions and victims, that conduct must be adequately punished to deter others from doing the same.

The need for general deterrence is particularly important here.  Because investment fraud schemes like the defendant's are both highly lucrative and difficult to detect and investigate, significant punishment is necessary to deter others from similar conduct. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it."). The need for general deterrence among advisors to private funds like those at issue here is particularly great.  While the private markets currently manage over $18 trillion in gross assets, they currently are not subject to many of the oversight requirements that apply to public company.  *See* Gary Gensler, "Statement on Private Fund Advisers Proposal," Feb. 9, 2022, available at https://www.sec.gov/news/statement/gensler-statement-private-fund-advisers-proposal-020922.  Should the defendant receive a light sentence, private fund advisors may be emboldened to engage in similar crimes, knowing that such schemes are difficult to detect and that, even if they are caught, they will not face significant repercussions. In addition, a lenient sentence would further erode the public's confidence in the integrity of financial markets by sending the message that financial professionals are only lightly punished when caught engaging in white-collar crimes.  To deter criminal conduct by individuals like the defendant, effectuate the

purpose of the securities fraud laws, and send an appropriate message that this type of fraud will not be tolerated, a significant sentence is accordingly warranted.

III.    **The Sentencing Guidelines Loss Enhancement is Appropriately Considered in Connection with Sentencing.**

The Court should reject the argument that imposing a sentence influenced by the Guidelines "would be inappropriate" here.  Dkt. 72 at 35.

Economic loss, which serves as a significant enhancement – but not the only one – to the defendant's Guidelines range in this case serves a suitable starting place for assessing culpability because it provides a practical proxy for viewing the magnitude of the crime.  Here, the parties have stipulated that the fraud resulted in approximately $129,506,992 to more than 10 victims throughout the course of the scheme.  Even courts that have criticized the Sentencing Guidelines as excessively punitive toward white-collar defendants have acknowledged that the scope of the economic loss should be a factor considered, among others, in fashioning an appropriate sentence. Furthermore, the criticisms that are leveled at the loss Guidelines – namely that they overstate the true loss by including theoretical losses, or losses beyond the defendant's control – do not apply in this case, in which real losses were incurred by the victims.  These losses do not represent a single loss from a single fraudulent act by the defendant, but rather are the product of dozens, if not hundreds, of fraudulent acts and statements made by the defendant and his co-conspirators throughout the course of more than ten years.  As such, the magnitude of the loss here is a suitable proxy for the magnitude of the defendant's wrongdoing.

The defendant makes arguments about average sentences under the fraud Guidelines.  Dkt. 72 at 32.  But this is not an average fraud.  Hu perpetrated a decade-long Ponzi-like scheme with a loss amount of more than $129 million and real victims.  Average sentences of 18 to 36 months' imprisonment across all fraudulent schemes are irrelevant.

**IV.    A Substantial Sentence of Imprisonment is Necessary to Avoid Unwarranted Sentencing Disparities.**

The examples of sentences the defendant proffers as varying substantially from the Guidelines range do not support the 60-month sentence that he seeks.  For example, the defendant in *United States v. Casperson*, 16 Cr. 414 (JSR), Dkt. 34, received a sentence of four years for defrauding investors out of approximately $38 million and misappropriating more than approximately $8 million from his former employer – causing a total loss of approximately $46 million, which is only approximately one third of the stipulated estimated loss amount here.  In *United States v. Cooney*, 16 Cr. 371 (RA/PKC), the defendant was sentenced to 30 months' imprisonment after receiving a minor role reduction for his role in defrauding a Native American tribal entity and various investment advisory clients in $60 million fraudulent scheme (the "Tribal Bond Scheme") in a scheme that took place over approximately two years.  That sentence was in stark contrast to the sentences imposed on the mastermind of the scheme, defendant Jason Galanis, who received a sentence of 173 months' imprisonment in August 2017, and then, after his conviction was vacated and he was resentenced, received 189 months' imprisonment for his role in the Tribal Bond Scheme and a prior fraudulent scheme for which the total combined losses were more than $80 million.  *United States v. Jason Galanis*, 16 Cr. 371 (RA/PKC), Dkt. 233 (173-month sentence imposed for Tribal Bond Scheme, 113 months of which was to run concurrent with prior fraudulent scheme); *United States v. Jason Galanis*, 15 Cr. 643 (PKC), Dkt. 558 (at resentencing, total of 189-month sentence imposed for both fraudulent schemes).  The defendant's conduct in this case is much more akin to Jason Galanis's conduct in his criminal schemes – a leader who, alone and with others, devised a multifaceted plan to defraud his victims and executed that plan throughout the course of more than a decade, causing more than a hundred million dollars of losses to his victims.

18

Other recent examples of sentences in securities fraud cases for leaders of massive fraudulent schemes, like the defendant's, are more analogous.  In *United States v. Sharma*, 16 Cr. 371 (LGS), Dkt. 470, lead defendant Sohrab Sharma who was the mastermind of a year-long fraudulent scheme to induce victims to invest more than $25 million worth of digital currencies, was sentenced to eight years' imprisonment.  In *United States v. Borland*, 18 Cr. 487 (KPF), Dkt. 110, the defendant, who, as the owner of an investment fund, perpetrated a $26 million investment fraud scheme was sentenced to seven years' imprisonment.  In *United States v. Bergstein*, 16 Cr. 746 (PKC), Dkt. 420, the defendant, who devised and executed a two-year long scheme to defraud investors of more than $26 million was sentenced to eight years' imprisonment.

The defendant here perpetrated a scheme for more than 10 years that involved defrauding the investment advisory clients that he owed fiduciary duties to serve and protect.  His crimes caused real losses to real victims.  Based on an individualized assessment of this defendant, the nature of the crimes that he committed, and the impact of those crimes on the victims in this case, a substantial sentence of imprisonment is necessary to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  *See* 18 U.S.C. § 3553(a)(6).

## V.     The Defendant Did Not Provide "Substantial Assistance" to the Government.

The defendant's assertion that he "extensively shared information" with the Government (Dkt. 72 at 6) is an exaggeration.  The defendant proffered three times with the Government and, when the Government learned – from other sources – that the defendant had possession and control over an approximately $6.3 million check representing proceeds of the fraudulent scheme, the defendant, at the Government's request, agreed to transfer control of those funds to the Government for purposes of forfeiture.  The Government acknowledges the credit the defendant should get for his willingness to be interviewed by the Government and for agreeing to help the

Government secure $6.3 million in proceeds from his fraud. However, the information the defendant provided about himself and other members of the conspiracy was too limited in nature and in forthrightness to provide meaningful assistance – let alone substantial assistance – in the investigation and prosecution of others and, therefore, the Government elected not to proceed with further proffers with this defendant.

**VI.     The Defendant's Family Ties and Personal History Do Not Support the Substantially Below-Guidelines Sentence He Seeks.**

The defendant's letters of support are noteworthy in that they demonstrate that the defendant committed this brazen scheme — time and again choosing lies and deceit for personal and professional gain — notwithstanding his relatively privileged personal history and the strong affection and support provided by his extensive network of family and friends. The defendant had a strong familial support network, options, education, resources, and opportunities. Instead, he chose lies and deceit for more than ten years.

While it is entirely appropriate for the Court to take into account the letters of support for the defendant in connection with sentencing, the Government respectfully notes that the many attestations to the defendant's good character do not set him apart from the typical white collar defendant. Rather, this collection of letters:

> falls into a pattern advanced by a subset of the white collar criminal. This category encompasses a select class: distinguished, reputable, highly esteemed model citizens such as this defendant. The list of their achievements and virtues is long and impressive. Let us count the ways. At home, they are good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners. To their community's charities and public causes they are generous patrons and sponsors.

*United States v. Regensberg*, 635 F. Supp. 2d 306, 308 (S.D.N.Y. 2009). In other words, the letters in this case are typical of the letters submitted by white collar criminals, and do not set the

defendant apart from other similarly-situated defendants. Rather, as Judge Marrero explained in his thoughtful opinion in *Regensberg*, in which the defendant also described a gambling addiction, casting the defendant "as the upright citizen who once went astray overlooks or improperly minimizes perhaps the darkest aspect of his deeds," the conduct of which more appropriately "summons the image of the wolf in sheep's clothing. It is precisely the defendant's mantle of integrity and benevolence that serves as cover for an invidious end, enabling him to move about his game undetected, the better to prey upon those who least expect it." *Id.*

The defendant's personal history and circumstances, and the letters of support he submits, do not mitigate the nature and seriousness of his criminal conduct, and they do not obviate the need for a sentence of incarceration that would serve as just punishment and afford adequate deterrence to criminal conduct.

## RESTITUTION AND FORFEITURE

Victims in this case have recently provided submissions to the Government setting forth their positions on what they are owed in restitution, which submissions the Government has provided to the defense.  Because of the complicated nature of the calculations involved in determine the appropriate restitution amount, which the parties are working toward resolving, the Government, with the consent of the defendant, respectfully requests, pursuant to 18 U.S.C. § 3664(5), additional time to ascertain each victim's losses and present the Court with a proposed restitution order.

In addition, consistent with the Consent Preliminary Order of Forfeiture entered by the Court in connection with the defendant's plea proceeding, the Government will provide the Court with a proposed Final Order of Forfeiture in the amount of $129,506,992.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that a substantial sentence of imprisonment, consistent with the downward variance to 15 years of imprisonment recommended by the Probation Department, would be reasonable and just in this case.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:    _____/s/_____
Negar Tekeei
Drew Skinner
Alex Rossmiller
Assistant United States Attorneys
Southern District of New York